JAMES BOWEN, complainant-appellant,

*v.*

GEORGE A. PURSEL et al., defendants-respondents.

[Submitted February term, 1931. Decided October 19th, 1931.]

*Mr. John Milton,* for the complainant-appellant.

*Mr. O. D. McConnell,* for the defendants-respondents George A. Pursel, Frank A. Pursel, Alice P. Skinner, Arthur M. Skinner, Catherine Schmidt, John Schmidt, Elizabeth P. Armstrong, Martin V. Armstrong, Vida E. Cook and Carl Cook.

*King & Vogt,* for the defendant-respondent Delmar S. Green.

The opinion of the court was delivered by

CASE, J.

This is on bill for specific performance of a contract for the sale of land and on counter-claim for cancellation of the instrument. An effort by complainant to strike the answer and counter-claim was adversely disposed of by this court in an opinion reported in *100 N. J. Eq. 319.* The matter later went to issue and trial. The decree in chancery dismissed the bill and gave the defendants the relief sought in their counter-claim. From that decree complainant appeals.

The property passed by descent from Emma J. Pursel to her six children, George, Frank, Alice, Catherine, Elizabeth and Vida. The four daughters were all married. The contract was signed by all of these owners, as well as by the husbands of the women. Three of the daughters signed the contract on Sunday, April 5th, 1925, and all of the vendors acknowledged their signatures on that day.

The bill as filed prayed performance of the contract in accordance with its terms, namely, the conveyance of title in fee-simple, free from all encumbrance, except the right of a yearly farmer tenant then in the midst of his term.

At the opening of the trial counsel for the complainant said: "We also held ourselves ready in case it be found that the contract of the married women is invalid. In other words, if the defendants sustain their allegations in that respect, we tender ourselves ready to take the title of the men owners —the male owners—subject, of course, to an abatement in whatever sum the court might find proper because of the failure to get the title of the married women." Precisely what counsel meant by "the men owners—the male owners" appears more unmistakably on his brief: "The appellant seeks to have the contract specifically enforced as to the male co-tenants, George A. Pursel and Frank A. Pursel, each of whom have a one-sixth undivided interest, as well as against

the husbands of the female heirs. \* \* \* The situation now before the court differs from that existing at the time of the motion to strike, and at the time of the decision of this court thereon. The changed circumstance arises from the tender of the appellant-vendee to accept a conveyance of those against whom the contract is enforceable, viz., the male heirs of Emma Pursel and the husbands of the female heirs, subject to the fishery right so far as it exists. \* \* \* The contract is enforceable against the husbands of the female heirs." Thus the offer was to accept an abatement in lieu of the signatures of the four women only. The complainant stood (and stands) upon his alleged right to compel the husbands of these women to sign the deed and convey their several curtesy rights.

The four women made their acknowledgments on Sunday. Therefore specific performance cannot be had against them. *Bowen* v. *Pursel, supra.* It is not contended that the husbands of these women signed with other thought or purpose than to relinquish their several rights as ancillary to the conveyance of the fractional fee owned by their respective wives. Upon this posture of law and fact, the women being unwilling to convey, obvious difficulties are presented against compelling the husbands by legal process to convey their curtesy rights. Acting upon the law as it was at the time of the execution of the contract it would be necessary to ascertain the fact as to the birth of a child, the respective ages of the wife and the husband, the probable duration of the life of each, and thereupon to determine whether the husband would in fact outlive the wife and, if so, by how long, and what proportion of the wife's one-sixth part of the sale price should be assigned to this interest. The determination of the abatement would be a difficult matter (*Milmoe* v. *Murphy, 65 N. J. Eq. 767*), and would be impossible of precise calculation except upon the averages furnished by life tables. These problems, in the case at bar, are multiplied by the factor of four and involve the major portion of the title. Moreover, the proposition that the husband's right or estate by the curtesy can be conveyed by him apart from his wife has not

been determined (*Bucci* v. *Popovich, 93 N. J. Eq. 121, 511*);
and we do not now find it necessary to consider the phases,
characteristics and attributes of that right. Its known inci-
dents as applied to the circumstances of this case, the per-
centage of the ownership beyond the reach of specific per-
formance and the mistake and misrepresentation connected
with the fishing agreement mentioned later in this opinion
combine to make the justice of specific performance a judic-
iable question.

On a bill for specific performance the court of chancery
will grant or refuse its aid, according to the justice of the
case. *Plummer* v. *Keppler, 26 N. J. Eq. 481.* This court,
speaking through Mr. Justice Van Syckel, in *Blake* v. *Flatley,
44 N. J. Eq. 228* (at *p. 231*), said:

"It is also held that courts of equity will not interfere to
decree a specific performance except in cases where it would
be strictly equitable to make such a decree. Where, there-
fore, the contract shall be enforced specifically, must rest in
the sound and reasonable discretion of the court, depending
on the equity of the particular case and the nature of the
objections to it. It must determine what are the objectionable
circumstances which will control its jurisdiction in such
cases, within the established rules of equity, though none of
these rules are of absolute obligation and authority in all
cases."

It was considered by Vice-Chancellor Stevens in *Corby* v.
*Drew, 55 N. J. Eq. 387, 395,* where the title was in six parts,
each of which was subject to a complication, that the court
of chancery in the exercise of a reasonable discretion ought
not, in that case, to enforce performance at all.

The court of chancery was within its field of reasonable
discretion in refusing the specific performance for which com-
plainant asked. The bill was properly dismissed.

After the death of David F. Pursel, husband of Emma J.
Pursel, and father of the six heirs-at-law, George A. Pursel,
oldest of the children, with the knowledge and acquiescence
of his brother and sisters, had full charge of the premises.
He made leases and granted fishing privileges with respect

thereto. Under date of June 12th, 1922, George A. Pursel acting, according to the recital in the instrument, "individually and for the heirs-at-law of Emma J. Pursel," entered into a self-termed "indenture of lease" with Andrew J. Green wherein he did "demise and to farm let" the exclusive "fishing right or privilege of the stream known as the Pequest creek on the farm known as the Pursel farm," for a term of ten years commencing April 1st, 1923, for the term rental of two hundred dollars. The instrument was acknowledged and was recorded in the Warren county clerk's office, July 3d, 1922. The complainant had early and actual knowledge of the existence of this instrument as well as of its significance in the minds of the vendors. By his own testimony it appears that he had such knowledge as early as the summer of 1924 when he talked with George Pursel about the purchase of the farm and did not succeed in closing the bargain "because he [Pursel] said he had a fishing lease or something on the property and he couldn't sell it." At the resumption of negotiations in March, 1925, the complainant and his attorney, Mr. Edward P. Stout, who expected also to obtain an interest in the farm upon the consummation of the sale, were informed in detail of the fishing agreement and of the fact that if it was valid it was an obstacle in the way of selling the farm. Pursel showed the instrument to both Bowen and Stout. Mr. Stout testifies that he then said to Pursel, "in my opinion this agreement is invalid, but I don't know it all and when I get back to my office I am going to look in my library books to see whether the opinion which I have now is correct," that Stout returned to his office and found a certain case which he cited to Mr. Bowen, that on April 3d, Stout drew the agreement and sent it to the vendors for execution by them, that on April 6th Pursel came to Stout's office with the agreement fully executed and that Stout then cited to Pursel the case that Stout had found. The testimony adduced by the defendants enlarged considerably upon this version and is to the effect that Stout had said at the earlier conference that in his opinion the fishing agreement was no good; that Bowen did not want the farm if the fishing agree-

ment was valid; that the agreement was either good in its entirety or it was not good at all; that Stout would go back to his law books and if he found the fishing agreement was invalid he would send Pursel an agreement for sale with a check for ten per centum of the purchase price; that Stout did send the agreement and the part payment, from which the vendors concluded that Stout had found after study that the agreement was invalid, and with that understanding the vendors executed the agreement that George Pursel on arriving with the executed agreement at Mr. Stout's office and before closing the transaction demanded to know about the legality of the fishing lease, whereupon Mr. Stout took a law book from the shelf, read from it to Pursel and said that the fishing agreement was no good either against the remainder of the heirs or against George Pursel personally and that Green could not sue Pursel for damages. It was admitted by Mr. Stout on the witness stand that Bowen was buying the farm for the fishing privilege, and if he couldn't have that he didn't want the farm; that it was the fishing and not the farm that he wanted.

The vice-chancellor found that complainant's attorney "persuaded him [George A. Pursel] and his co-tenants that the Green agreement was invalid. The defendants executed the contract with the complainant because they were mistaken as to the state of their title and they were led into that mistake by complainant's attorney." There is ample evidence to sustain that conclusion of fact, and, giving the vice-chancellor's finding its appropriate weight (*Cartan* v. *Phelps, 91 N. J. Eq. 312*), we accept it as sound. It remains to consider whether the case will sustain the decree in favor of the defendants on their counter-claim. The contention of the complainant is that the mistake is one of law and that such a mistake, even though mutual, is no bar to specific performance. We assume that this argument is intended to be directed also against sustaining the counter-claim.

This court has already held that, whether or not the fishing agreement is binding upon any other of the appellants, it is binding upon George A. Pursel. *Bowen* v. *Pursel, supra.*

The instrument, therefore, was not invalid. The purchaser and the vendors all entered into the contract under the mistake that it was invalid; with this further vital factor that the purchaser, by his attorney and potential co-purchaser, induced the vendors into the mistake by a misrepresentation of the fact made, however, innocently, with the intent that the vendors would rely thereon. The subject-matter of the mistake was of the utmost importance to both parties. The vendors would not have sold and the vendee would not have bought if the agreement had been known to be valid. It is valid at least in part. Complainant in his answer to the counter-claim offered to take title subject to any rights that Andrew J. Green might have in the lands and premises by virtue of his fishing lease, but there were contingencies which this did not meet, as for instance the question of personal liability of George A. Pursel to Green because of the deficiency in the extent of the interest conveyed, if, as complainant insists, that interest was limited to George's one-sixth share. Paraphrasing the language in *Green* v. *Morris and Essex Railroad Co., 12 N. J. Eq. 165, 171,* there was no want of ordinary prudence in the vendors' relying upon the judgment of the complainant's attorney; he was a lawyer by profession and it was natural and becoming that the vendors should have confided in him. Ignorance of the law furnishes no excuse to a person either for a breach or for an omission of a duty and that the principle applies to agreements entered into in good faith but under a mistake of the law is undoubtedly the general rule; but that the rule has its proper exceptions is beyond all dispute. *Ibid. 168.* In the case last cited a decree enjoining the defendants from setting up a deed as a bar to the complainant's recovery in an action at law was sustained, on appeal, by this court, though the view here expressed was that the equitable jurisdiction was on the ground of constructive fraud rather than of mistake. *15 N. J. Eq. 469.* In *Freichnecht* v. *Meyer, 39 N. J. Eq. 551,* a later decision of this court, Mr. Justice Dixon, after reviewing the cases on the effect of a mutual mistake of law, concludes (*p. 561*):

"But I think it will be found to accord with the decisions, and with the safe and equitable conduct of affairs, to establish this rule: that whenever the mistake of law is mutual, and the party jeopardized thereby can be relieved without substantial injustice to the other side, there equity will afford redress, especially if the party to be benefited by the mistake invokes the aid of equity to put him in a position where the mistake will become advantageous to him."

*Hummer* v. *Buerk, 90 N. J. Eq. 97,* is a still later instance of the application by chancery of its power to relieve from mutual mistake of law.

The only payment made by the complainant was of ten per centum of the purchase price, namely $600. Complainant did not otherwise materially alter his position. That sum was tendered to the complainant June 27th, 1925, and on August 1st, 1925, was deposited with the clerk in chancery where it has since been. By the decree it is directed to be paid with accumulations of interest to the complainant. The relief granted on the counter-claim was that the contract or agreement of sale was declared null and void and should be delivered up for cancellation, and that the vendors were entitled to the rents, issues and profits of the premises since the date of the said contract or agreement. We consider that this relief is within the authority of *Green* v. *Morris and Essex Railroad Co., supra,* and *Freichnecht* v. *Meyer, supra.*

The decree will be affirmed, with costs.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, CAMPBELL, LLOYD, CASE, BODINE, DALY, DONGES, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, JJ. 14.

*For reversal*—None.