997 A.2d 943

NICHOLAS KALOGERAS, PLAINTIFF–RESPONDENT, v. 239 BROAD AVENUE, L.L.C., 12 BRINKERHOFF, L.L.C., GOLDEN EAGLE DINER, INC., AND GOLDEN G, INC., DEFENDANTS– RESPONDENTS, AND MYINHO HAHN AND GOLDEN EAGLE MANAGEMENT, L.L.C., INTERVENORS–APPELLANTS.

Argued February 22, 2010—Decided June 16, 2010.

*Edward Sun Kiel,* argued the cause for appellants (*Cole, Schotz, Meisel, Forman & Leonard, P.C.,* attorneys).

*William C. Soukas,* argued the cause for respondent Nicholas Kalogeras (*Nowell Amoroso Klein Bierman, P.A.,* attorneys).

*Jan Alan Brody,* argued the cause for respondents 239 Broad Avenue, L.L.C., 12 Brinkerhoff, L.L.C., Golden Eagle Diner, Inc., and Golden G, Inc. (*Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein,* attorneys; *Mr. Brody* and *G. Glennon Troublefield,* of counsel and on the brief).

JUSTICE RIVERA–SOTO delivered the opinion of the Court.

After a contested sixteen-day bench trial spanning a period of seven months concerning a $6,500,000 agreement of sale of a diner, this appeal boils down to a single, narrow issue: whether, in the absence of any contractual provision directly on point, the transfer of a liquor license pursuant to a contract for the sale of a business is specifically enforceable. The Chancery court determined that the condition precedent of prior governmental approval necessarily was implied within the contract, even though the contract was silent in respect of whether the transfer of the liquor license was subject to prior approval pursuant to the New Jersey Alcoholic Beverage Control Act (ABC Act), *N.J.S.A.* 33:1–1 to –97. Based on that conclusion, the Chancery court ordered that the contract seller cooperate with the buyer in seeking to effectuate the transfer of the liquor license. The Appellate Division reversed, concluding (1) that "[t]here is no provision in the agreement which states that transfer of the [liquor] license is conditioned upon [Division of Alcoholic Beverage Control (ABC)] approval[,]" and (2) that, by "order[ing] specific performance of the sales agreement, including the provision for the transfer of the liquor license[,]" the Chancery court erred.

Whether a contract for the sale of a liquor license includes a specific provision conditioning the transfer of the license on the receipt of the necessary governmental approvals is immaterial to the enforcement of that contract; any obligation of prior governmental approvals imposed by the Legislature unstated in the contract but otherwise required by law necessarily is incorporated into the contract. In the circumstances presented, we conclude that the agreement of sale perforce included the legislatively mandated requirement that the transfer of a liquor license is

subject to the condition precedent of the receipt of all required governmental approvals. We further conclude that, inasmuch as the parties to the contract cannot compel the issuance of those approvals, the parties will be obliged, under the implied covenant of good faith and fair dealing, to cooperate with each other in seeking that license transfer. To the extent the Appellate Division's earlier holding in *Route 73 Bowling Center, Inc. v. Aristone*, 192 *N.J.Super.* 80, 469 *A.*2d 85 (App.Div.1983), has been interpreted differently, that interpretation is in error.

## I.

Although this case specifically addresses a narrow portion of a section of the ABC Act, it starts in an all-too-familiar place: a family squabble. In 1976, plaintiff Nicholas (Nick) Kalogeras and his brother Konstantinos (Gus) Kalogeras [1] purchased and thereafter co-owned a diner in Palisades Park. Their relationship deteriorated to the point that the brothers realized it was best that they separate their business interests. In 2002, they had the diner business appraised at $4,000,000. Because they were equal owners, they agreed that plaintiff Nick Kalogeras would receive one-half of that amount—$2,000,000—in exchange for the transfer of his interest in the diner business to a series of entities controlled by his brother Gus Kalogeras.[2] At the closing, plaintiff Nick

---

[1] For ease of reference and clarity, occasionally throughout this opinion the brothers Kalogeras are referred to by their nicknames; no disrespect is intended by that practice.

[2] They were 239 Broad Ave., LLC, 12 Brinkerhoff Ave., LLC, Golden Eagle Diner, Inc. and Golden G, Inc., each of which was named as a defendant in this lawsuit; all references to "defendants" in this opinion are to those corporate entities. As a practical matter, however, the entirety of the diner business—the realty on which the diner was located, the improvements on that realty that constituted the diner, the furniture, fixtures and equipment needed to operate the diner located within those improvements, and the liquor license held by the diner—eventually were titled in either defendant 239 Broad Avenue, LLC or Golden G, Inc., entities owned and controlled by Gus Kalogeras, who is not a named defendant in this case.

Kalogeras was paid $1,050,000 and took back a $950,000 purchase money mortgage note bearing eight-percent interest and payable in equal installments over a ten-year period.

Plaintiff Nick Kalogeras feared that his brother's ultimate interest was to "flip" the diner, that is, to sell it to another for an amount greater that the one for which it was appraised. For that reason, the agreement of sale also provided that plaintiff Nick Kalogeras would have two additional sources of contract rights. First, in order to protect against being "short-changed" by a quick resale of the business at a profit, the agreement required that, if the business was sold within two years from the date he sold his interest to his brother, plaintiff Nick Kalogeras would be entitled to one-half of the sale proceeds in excess of the $4,000,000 appraised amount for the business on which the brothers agreed. Second, and more germane to this appeal, the agreement also provided that, while any portion of the ten-year $950,000 purchase money mortgage note remained unpaid, plaintiff Nick Kalogeras retained a right of first refusal on any sale of the business.[3]

In 2005, three years after the sale of plaintiff Nick Kalogeras's interest to his brother Gus Kalogeras and, thus, beyond the two-year profit-sharing period agreed to by the brothers in 2002, defendants entered into an agreement of sale with Byung Kim. That agreement provided that defendants would sell to Kim the diner—including the realty, improvements, furniture, fixtures and equipment, and the liquor license—in exchange for $6,500,000.[4] It also

---

[3] Whether the agreement in fact provided for a right of first refusal was bitterly contested between the parties; its existence was an issue on appeal that was not addressed by the Appellate Division. *See infra* at 356–57 n. 6, 997 *A.2d* 947 n. 6.

[4] Although the agreement of sale recites that the purchase price is $5,800,000, the Chancery court found that, based on an accountant's advice, the purchase price stated in the contract of sale had been reduced by $700,000 reflected in an additional, separate promissory note issued by Kim to defendants. Thus, the aggregate purchase price for the diner as an operating concern was $6,500,000.

disclosed to [Kim] that [plaintiff Nick Kalogeras,] a predecessor co-owner of the within property which was sold to [defendants] contains a provision for the [r]ight of [f]irst [r]efusal which must be submitted to [plaintiff Nick Kalogeras] for review. It is understood that the within contract is subject to said option, and if so exercised by [plaintiff Nick Kalogeras], this contract shall be cancelled, and all deposits held shall be returned to [Kim].

In respect of the liquor license itself, the agreement provided that, among other assets, "Liquor License # 0245 33 027 001" would be sold and transferred from defendants to Kim "free and clear[;]" that of the $6,500,000 purchase price, $200,000 was "allocated" to the liquor license; that defendants would "[e]xecute and deliver such other documents as are necessary and appropriate to carry out the transfer of the [l]iquor [l]icense to [Kim;]" that Kim "covenant[ed] and agree[d] to comply with all laws and requirements, whether Federal, State, Municipal, or other which affect the [liquor l]icense[;]" that Kim "covenant[ed] and agree[d] that [he] has the obligation to pay all charges, expenses and fees concerning the transfer of [the liquor l]icense to [Kim;]" and that defendants agreed "[t]o use [their] diligent and best efforts to effect the consummation of the transactions contemplated" by the agreement of sale. Also, the parties agreed that "[i]f any provision of this Agreement is held to be invalid or unenforceable, all other provisions shall, nevertheless, continue in full force and effect."

When that agreement was disclosed to plaintiff Nick Kalogeras, he (1) negotiated with intervenor/plaintiff Myinho Hahn, (2) sold the right of first refusal to Hahn for $100,000, and (3) contemporaneously exercised the right of first refusal.[5] Defendants countered by simply terminating the underlying agreement of sale with Kim, purportedly because Gus Kalogeras no longer was interested in selling the diner and thought it was undervalued.

---

That conclusion also was challenged before the Appellate Division. *See infra* at 356–57 n. 6, 997 *A.*2d at 947 n. 6.

[5] Golden Eagle Management, LLC, an entity owned and controlled by Hahn, also is named as a plaintiff. Again, for simplicity, all references to Hahn also include that limited liability company.

Plaintiff Nick Kalogeras brought suit in the Chancery Division, seeking specific performance of the right of first refusal and other damages; intervenor/plaintiff Hahn sought, and was granted, leave to intervene as a party plaintiff, also demanding specific performance of the right of first refusal and commanding a closing, with Hahn as the purchaser, under the defendants-to-Kim agreement.

After a lengthy and bitterly contested bench trial, on March 9, 2007, the Chancery court entered judgment in favor of plaintiff Nick Kalogeras and intervenor/plaintiff Hahn on their separate requests for specific performance, together with other ancillary relief. In respect of the transfer of the liquor license, the Chancery court ordered that Gus Kalogeras "shall not interfere with and shall cooperate with [intervenor/plaintiff] Hahn in the transfer[ ] of the liquor license from [defendants] to an entity to be established by [intervenor/plaintiff] Hahn." The Chancery court's March 9, 2007 judgment concluded by ordering that "[t]he closing (transfer of all rights, title and interest) shall take place on or before December 10, 2007." On defendants' application, the Chancery court stayed its judgment pending appeal.

Defendants appealed, and plaintiff Nick Kalogeras and intervenor/plaintiff Hahn cross-appealed.[6] In an unpublished opinion

---

[6] In addition to the argument that specific performance of the transfer of the liquor license could not be granted because the agreement lacked the condition precedent of governmental approval of that transfer, defendants argued before the Appellate Division that the Chancery court's decision should be reversed because (1) the right of first refusal claimed to have been exercised by plaintiff Nick Kalogeras had not been ratified by Gus Kalogeras; (2) plaintiff Nick Kalogeras and intervenor/plaintiff Hahn are precluded from equitable relief based on the doctrines of unclean hands, equitable estoppel, and loss-shifting; (3) the breach of a confidentiality agreement barred relief; (4) specific performance should not have issued; and (5) the Chancery court lacked in personam jurisdiction over Golden G, Inc., Gus Kalogeras or his son. Defendants also argued that, if the Chancery court's judgment was to be affirmed, the closing should be set for nine months after that affirmance. Because the Appellate Division addressed solely the question of specific performance of a liquor license transfer, it did not consider any of the other arguments defendants advanced on

that focused exclusively on whether a liquor license transfer can be specifically enforced, the Appellate Division reversed. It reasoned that the ABC Act "requires a license for the sale of alcoholic beverages for consumption on or off the licensed premises. *N.J.S.A.* 33:1–12." It explained that the ABC Act "generally provides that a license to sell liquor is not property that can be sold or transferred except with the approval of the director of the ABC or other issuing authority. *N.J.S.A.* 33:1–26." Noting that "[t]he 'application for transfer [of a liquor license must] be signed and sworn to by the person to whom the transfer of license is sought and shall bear the consent in writing of the licensee to the transfer,' *ibid.*" the panel acknowledged that " 'the director or other issuing authority, as the case may be, may transfer any license issued by him or it respectively to the applicant for transfer by endorsing the license.' *Ibid.*"

Citing *Route 73 Bowling Center* for the " 'settled' principle 'that specific performance may not be granted for a contract of sale of a liquor license[,]' " *supra,* 192 *N.J.Super.* at 83, 469 *A.*2d 85 (citations omitted), the Appellate Division explained that "the principle was based on the rationale that the ABC 'should have unfettered discretion as to whether to approve or deny a transfer without having to consider possessory rights of a third party[,]' *ibid.*[,]" and that a " 'third party should [not] be permitted to have control of the licensed premises[,] and a right to the possession of the

appeal. The narrow nature of the Appellate Division's decision likewise limited the scope of the appeal before us.

Plaintiff Nick Kalogeras cross-appealed, claiming that (1) the agreement of sale provided for a purchase price of $5,800,000 and, therefore, the order of specific performance should have been at that price and not $700,000 higher; and that (2) his assignment of the right of first refusal to intervenor/plaintiff Hahn should have been voided for want of consideration and mutual assent. Intervenor/plaintiff Hahn's cross-appeal was limited to the proper amount of purchase price to which the right of first refusal attached, claiming, as did plaintiff Nick Kalogeras, that the purchase price should have been $5,800,000, and not $6,500,000. Neither of those arguments was preserved or is advanced before us.

license in the future was and is seen to give rise to such shadow control.' *Id.* at 83–84, 469 *A.*2d 85."

Applying those principles, the panel disagreed with the Chancery court's conclusion that defendants' "agreement to transfer the liquor license to Kim was conditioned upon ABC approval[,]" reasoning that "the record does not support that finding." Emphasizing that "[t]here is no provision in the agreement which states that transfer of the license is conditioned upon ABC approval[,]" it noted that the agreement of sale "sets forth conditions for closing on the transaction but approval by the ABC of the transfer of the liquor license is not one of those conditions." It thus concluded that, because defendants "had an absolute contractual obligation to transfer the liquor license that was not conditioned upon ABC approval[,]" and because "the purchaser had an absolute obligation to pay the full purchase price, including the $200,000 allocated for the license[, u]nder ... *Route 73 Bowling Center*, the sales agreement could not be specifically enforced."

The panel then distinguished *Darrah Food Services, Inc. v. Lambertville House, Inc.,* 202 *N.J.Super.* 447, 452, 495 *A.*2d 438 (App.Div.), *certif. denied,* 102 *N.J.* 329, 508 *A.*2d 207 (1985), explaining that "the situation presented [there] was different from that in *Route 73 Bowling Center* because in the earlier case the obligation to transfer the license was absolute, and in *Darrah Food Services,* the transfer was conditioned upon approval of the local ABC Board." (citation, internal quotation marks and editing marks omitted). It noted that "the power to determine who should have the privilege of a liquor license rests solely with the ABC[,]" and that "[t]he ABC's discretion should not be impinged upon by an order of a court." (citations, internal quotation marks and editing marks omitted). That said, the panel differentiated between *Route 73 Bowling Center* and *Darrah Food Services* by pointing out that, in the latter, "the court had not ordered specific performance of a contract to transfer a liquor license[, but r]ather, the court had merely compelled the defendants to continue the liquor license transfer process which they voluntarily initiated[.]"

(citations and internal quotation marks omitted). It asserted that plaintiff Nick Kalogeras's and intervenor/plaintiff Hahn's reliance on *Darrah Food Services* was "misplaced" because "[t]here, the agreement was expressly conditioned upon ABC approval of the transfer of the liquor license[, while i]n this matter, there is no comparable provision in the agreement."

The Appellate Division incorrectly noted that "here the [Chancery] court did not simply order the sellers to assist in the transfer application process." It stated, albeit in error, that "[t]he [Chancery] court ordered specific performance of the sales agreement, including the provision for the transfer of the liquor license[and that] *Darrah Food Services* makes clear that a court may not grant such relief." [7] It therefore reversed the judgment of the Chancery court.

Intervenor/plaintiff Hahn sought certification, which was granted. *Kalogeras v. 239 Broad Avenue, LLC*, 200 *N.J.* 547, 985 *A.2d* 645 (2009). For the reasons that follow, we reverse the judgment of the Appellate Division, reinstate the judgment of the Chancery court, and remand the case to the Appellate Division for its consideration of the remaining arguments advanced in the appeal and cross-appeal.

## II.

Although presented as five separate questions, intervenor/plaintiff Hahn advances but a single substantive argument: that the Chancery court properly determined that a grant of limited specific performance of this contract of sale—which is silent on the question of whether governmental approvals are required as a condition precedent to the transfer of a liquor license—should

---

[7] As noted earlier, although the Chancery court ordered specific performance of the sales agreement, it specifically limited its effect in respect of the liquor license transfer to require that Gus Kalogeras "shall not interfere with and shall cooperate with [intervenor/plaintiff] Hahn in the transfer[ ] of the liquor license from [defendants] to an entity to be established by [intervenor/plaintiff] Hahn."

issue. He asserts that the Chancery court properly tempered that judgment with the recognition that, because a liquor license cannot be transferred save upon receipt of appropriate governmental approvals, the seller's contractual obligation will be satisfied if it cooperates with the buyer in the liquor license transfer process.

Defendants take a more limited view. They urge that a court may validly order specific performance in the nature of cooperation in a liquor license transfer only when the sales agreement providing for that transfer also explicitly imposes a duty of cooperation. In defendants' view, because the contract of sale here lacked any such explicit duty of cooperation and there was no basis in the record to conclude that the parties agreed that the transfer of the liquor license would be subject to prior governmental approval, they claim that the position advanced by intervenor/plaintiff Hahn contravenes long-standing precedent that the transfer of a liquor license is not specifically enforceable.[8]

## III.

The pervasive and strict regulation of the distribution, sale and consumption of alcoholic beverages is an integral part of New Jersey's alcoholic beverage control matrix. The Legislature has declared that there are many, overlapping public policy concerns that undergird the ABC Act:

> The Legislature hereby finds and declares as the public policy of this State and the legislative purpose of [the Alcohol Beverage Control Law] the following:
>
> (1) To strictly regulate alcoholic beverages to protect the health, safety and welfare of the people of this State.
>
> (2) To foster moderation and responsibility in the use and consumption of alcoholic beverages.
>
> (3) To protect the collection of State taxes imposed upon alcoholic beverages.

---

[8] Plaintiff Nick Kalogeras also participated in this appeal, reiterating the arguments he advanced before the Appellate Division. However, because none of those arguments address the questions presented in the grant of certification, we need not discuss them further.

(4) To protect the interests of consumers against fraud and misleading practices in the sale of alcoholic beverages.

(5) To protect against the infiltration of the alcoholic beverage industry by persons with known criminal records, habits or associations. Participation in the industry as a licensee under this act shall be deemed a revocable privilege conditioned upon the proper and continued qualification of the licensee.

(6) To provide a framework for the alcoholic beverage industry that recognizes and encourages the beneficial aspects of competition.

(7) To maintain trade stability.

(8) To maintain a three-tier (manufacturer, wholesaler, retailer) distribution system.

(9) To maintain primary municipal control over the retailing of alcoholic beverages.

(10) To prohibit discrimination in the sale of alcoholic beverages to retail licensees.

[*N.J.S.A.* 33:1–3.1(b).]

Those public policy concerns inform and govern our analysis.

The ABC Act plainly sets forth that "[l]icenses are not transferable except as hereinafter provided." *N.J.S.A.* 33:1–26. That section also provides that "[o]n application made therefore[,] the director [of the ABC] or other issuing authority, as the case may be, may transfer any license issued by him or it respectively to the applicant for transfer by endorsing the license." *Ibid.*[9]

That rather straightforward statutory enactment, one entirely consonant with the remainder of the ABC Act, has generated confusing and, at times, seemingly contradictory litigation. Starting from the commonsense proposition that "[a] decree compelling a specific performance[,] a compliance with which manifestly rests in the will or discretion of a third party uncontrolled by the respondent, would be a vain decree, one which in truth and in fact the respondent would find it impossible to obey[,]" *Fiedler, Inc. v. Coast Fin. Co., Inc.,* 129 *N.J. Eq.* 161, 168–69, 18 *A.*2d 268 (E. & A.1941), New Jersey courts consistently have recognized that a

_____

[9] With minor modifications, those provisions have been part of the ABC Act since 1933. *See L.* 1933, *c.* 436, § 23 (specifically providing that "[l]icenses are not transferable" and that "[o]n application made therefor ... the commissioner or other issuing authority may transfer any license issued by him or it respectively").

contract for the transfer of a liquor license cannot "be specifically enforced for the reason that equity could not control the discretion of the local board of alcoholic beverage control whose approval of the transfer is required by statute." *Iavicoli v. DiMarco,* 142 *N.J. Eq.* 699, 700, 61 *A.*2d 247 (E. & A.1948). The basis for that restraint is firmly moored in practicality: "the inability of equity to direct [a governmental entity] in the exercise of a discretion vested in it." *Id.* at 701, 61 *A.*2d 247. *See also Takacs v. Horvath,* 3 *N.J.Super.* 433, 439, 66 *A.*2d 572 (Ch.Div.1949) (acknowledging court's "inability to direct the licensing authorities in the exercise of their discretionary duties").

In that context, this Court has recognized that "[a] liquor license, although transferable, is still to be considered a temporary permit or privilege, and not property, as it always has been, even before our Legislature so declared by statute, and this consideration is to continue to govern the relationship between state and local government and the licensee." *The Boss Co. v. Board of Comm'rs of Atlantic City,* 40 *N.J.* 379, 387–88, 192 *A.*2d 584 (1963) (citation omitted). In respect of the liquor license transfer process, we have explained that "the vitality of *N.J.S.A.* 33:1–26 is in no way diminished and will continue to protect the liquor license from any device which would subject it to the control of persons other than the licensee, be it by pledge, lien, levy, attachment, execution, seizure for debts or the like." *Id.* at 388, 192 *A.*2d 584 (citations omitted). We have cautioned that "the sound discretion of the issuing authority to issue, renew or transfer liquor licenses will not be disturbed ... as [a] transferee[ ] must still make application to the issuing authority as is required in the case of an original application for a license, *N.J.S.A.* 33:1–26, and must measure up to the qualifications required of licensees as set out in *N.J.S.A.* 33:1–25." *Ibid.* (citation omitted).

Within the Appellate Division, those limitations on transfer have resulted in an apparently inflexible rule:

A contract vendee of a license has such little status under the alcoholic beverage control statute that the courts will refuse to grant him specific performance against the vendor because so to do would be inconsistent with the inability of the court to

control the exercise of discretion by the local board, and because it would impair the absolute control which holders of licenses should retain over them.

[*Packard–Bamberger & Co. v. Borough Council of Oakland*, 87 *N.J.Super.* 92, 96, 208 *A.*2d 168 (App.Div.1965) (citations omitted).]

On that basis, the Appellate Division declared as "settled law in this state that specific performance may not be granted for a contract of sale of a liquor license." *Route 73 Bowling Center, supra*, 192 *N.J.Super.* at 83, 469 *A.*2d 85 (citations omitted). It explained that the alcoholic beverage control authorities "should have unfettered discretion as to whether to approve or deny a transfer without having to consider possessory rights of a third party." *Ibid.* It noted that "*N.J.S.A.* 33:1–26 . . . has been uniformly interpreted as prohibiting the remedy of specific performance based upon any contractual arrangement." *Id.* at 84, 469 *A.*2d 85. That said, *Route 73 Bowling Center* nevertheless recognizes that "[a]lthough specific performance cannot be ordered, a breach of this express agreement could provide a basis for the awarding of damages." *Id.* at 84, 469 *A.*2d 85. That is so because "[s]uch an award would in no way interfere with the local ABC Board's unbridled discretion in approving transfer of a license nor would it disturb the present owner's possession of the licensed premises or the license itself." *Ibid.*

Two years after *Route 73 Bowling Center*, the Appellate Division interpreted that decision and somewhat softened its contours. In *Darrah Food Services, supra*, 202 *N.J.Super.* at 452, 495 *A.*2d 438, the court again noted that the discretion reposed in an alcoholic beverage control governmental entity "should not be impinged upon by the order of a court[.]" It noted that "[d]enial of specific performance where contracts have provided for the outright transfer of a liquor license has been the rule when a local board has acted in a manner inconsistent with the agreement and denied the application." *Ibid.* Focusing instead on those instances where the parties have agreed to cooperate in securing a liquor license transfer, the panel explained that the " 'uniform[ ] interpret[ation of *Route 73 Bowling Center*] as prohibiting the remedy of specific performance based upon any contractual arrangement'

... should not be construed to limit contracts such as the one before this court which in no way impinge upon the discretion of the local ABC Board." *Id.* at 453, 495 *A.*2d 438 (quoting *Route 73 Bowling Center, supra,* 192 *N.J.Super.* at 84, 469 *A.*2d 85). It sensibly reasoned that "[t]he statutory purpose of according absolute discretion to the Alcoholic Beverage Control Commission or the local boards is not thwarted by permitting parties to agree to cooperate in applying to a board for the transfer of a liquor license." *Id.* at 453–54, 495 *A.*2d 438.

That evolution leads us to the conclusion we reach today, one which is informed by like decisions of our sister states. For example, in *Greve v. Leger, Ltd.,* 64 *Cal.*2d 853, 52 *Cal.Rptr.* 9, 415 *P.*2d 824 (1966), the Supreme Court of California considered whether a statutory obligation of governmental approval for the transfer of a liquor license would be implied in a contract otherwise silent on the subject. Noting that "all licenses are issued only to specific individuals for use at specific locations, and all transfers are subject to official investigation and approval in the same manner as the initial issuance of a license[,]" the court concluded that "the omission of a provision for such approval in the private agreement of the parties does not affect the need for official sanction." *Id.* at 829 (citations omitted). From that premise, the court held that "[t]he requirement for such approval is an implied condition of all agreements for the transfer of alcoholic beverage licenses, whatever the context and whatever the nature of the consideration." *Ibid.* (citations omitted). That is so because in California—as in New Jersey—a governmental agency, "not the parties, transfers licenses. The parties ... merely apply to the [governmental agency] for a transfer." *Harriman v. Tetik,* 56 *Cal.*2d 805, 17 *Cal.Rptr.* 134, 366 *P.*2d 486, 490 (1961). *See also Richards v. Dep't of Alcoholic Beverages Control,* 139 *Cal.App.*4th 304, 42 *Cal.Rptr.*3d 782, 787 (2006) (following both *Greve* and *Harriman*). Thus, *Greve* plainly explains that "holders of alcoholic beverage licenses may freely contract to transfer those licenses to other persons, subject, of course, to official approval of the

transfer. Such contracts are valid and specifically enforceable." *Greve, supra,* 415 *P*.2d at 827 (citations omitted).

*Greve's* holding—that the requirement of governmental approval for the transfer of a liquor license is implied in any contract providing for such a transfer—has been followed elsewhere. *See Uptick Corp. v. Ahlin,* 103 *Idaho* 364, 647 *P*.2d 1236, 1240 n. 4 (1982) (noting that liquor license transfers are subject to governmental approval and "in the absence of such a showing, any alleged transfer was ineffective"); *Beard v. McCormick,* 147 *Mont.* 361, 411 *P*.2d 964, 965 (1966) (holding that lease of tavern and assignment of liquor license, although subject to governmental approval, "[a]s between the parties . . . stand together and are inseparable"); *Elliot v. Resnick,* 114 *Nev.* 25, 952 *P*.2d 961, 966 (1998) (concluding that liquor license "transfer was not illegal or contrary to public policy[but that] the transfer will not be completed until the City's conditions are satisfied" and citing *Greve* for proposition that "transfers or sales of licenses are valid and specifically enforceable, but are subject to official approval" (footnote omitted)); *Samuel's Realty Co. v. McCarthy,* 512 *A*.2d 872, 874 (R.I.1986) (holding that, "[a]s a general rule, the holder of a liquor license may freely contract to transfer the license to other persons subject to official approval of the transfer, and such contracts are valid and specifically enforceable" (citations omitted)); *Sprecher v. Weston's Bar, Inc.,* 52 *Wis.*2d 677, 191 *N.W.*2d 212, 213 (1971) (holding that "a provision for the assignment of a liquor license is unenforceable against the licensing authority but not necessarily void for all purposes"); *Kurpjuweit v. Northwestern Dev. Co.,* 708 *P*.2d 39, 46 (Wyo.1985) (holding that "the provision of [a contract] containing the requirement that [the liquor licensee] transfer the liquor license to [a third party] is valid and enforceable as between the parties [but that a]ny such transfer is, however, subject to the provisions of [governing law] requiring a public hearing and approval by the licensing authority").

▪▪▪ Informed by the authorities from our sister states, but firmly tethered to our own jurisprudence, we too now hold that the requirement for governmental approval is an implied condition of all agreements for the transfer of alcoholic beverage licenses. In so doing, we start from the premise that "every contract in New Jersey contains an implied covenant of good faith and fair dealing." *Sons of Thunder v. Borden, Inc.*, 148 *N.J.* 396, 420, 690 *A.*2d 575 (1997) (citations omitted). That is, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]" *Palisades Properties, Inc. v. Brunetti*, 44 *N.J.* 117, 130, 207 *A.*2d 522 (1965) (citations and internal quotation marks omitted); *see also Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 *N.J.* 210, 224–25, 864 *A.*2d 387 (2005) (same). Thus, when parties contract to transfer a liquor license, they perforce covenant to act in a manner that will seek to achieve that goal, even if its attainment rests in the discretionary act of another. Stated differently, the fact that a governmental entity may possess the ultimate right to determine whether a contractual term is to be enforced does not relieve the contracting parties from the obligation to interact in good faith. For that reason, we detect no rational basis on which to extrapolate—from the undeniable fact that a governmental agency must approve a liquor license transfer—a principled theory that excuses a party to a contract from good faith performance, to the extent it can, of its contractual duties.

▪▪▪ In a like vein, we find unpersuasive the reasoning that would require that a contract explicitly set forth either the obligation to act in accordance with the implied covenant of good faith and fair dealing or with knowledge of the law. In the first instance, the implied covenant of good faith and fair dealing is precisely what its name allows: it is an *implied* covenant. Furthermore, the governing statute, *N.J.S.A.* 33:1–26, clearly and unequivocally establishes a legal duty: it requires that any transfer of a liquor license requires governmental approval. In that

context, it goes without saying that "ignorance of the law, however, is not a sufficient basis to excuse compliance with the requirements of an established rule of law[.]" *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla,* 142 *N.J.* 280, 302–03, 662 *A.*2d 509 (1995). As New Jersey courts have long recognized, "[i]gnorance of the law furnishes no excuse to a person either for a breach or for an omission of a duty[.]" *Bowen v. Pursel,* 109 *N.J. Eq.* 67, 73, 156 *A.* 649 (E. & A.1931).

█ On the whole, then, we perceive no reason to immunize a liquor license transfer from the application of the foregoing principles. We therefore conclude that the better, more principled rule of law is as reasoned by the Appellate Division in *Darrah Food Services* and the Supreme Court of California in *Greve:* that the requirement for governmental approval is an implied condition of all agreements for the transfer of alcoholic beverage licenses, and that, subject to that condition precedent, a contract for the transfer of a liquor license can be specifically enforced, but only to the extent the parties would be required to act, in accordance with the implied covenant of good faith and fair dealing, in respect of the statutory condition precedent of prior governmental approval. To the extent *Route 73 Bowling Center* is interpreted otherwise, it is disapproved.

█ For those reasons, we conclude that the Chancery court properly considered the basis of the bargain between the parties—the sale of an operating diner, inclusive of its liquor license—and molded its judgment to achieve, to the best effect possible, that result. In doing so, the Chancery court properly "determined that the contract is enforceable [because c]ritical terms are expressed with[ ] reasonable certainty, and it would not be harsh, or oppressive to enforce the terms." The Chancery court also rightly noted that "[o]verriding this entire matter is all [of] the parties' obligation to act with good faith, and fair dealing." It sensibly concluded that its "decision puts the part[ies] in the exact position they anticipated being in, and bargained for in July of 2005." Acknowledging that, in the absence of administrative action, it

justifiably could not order the liquor license transfer, the Chancery court enforced so much of the contract between the parties as then possible: it ordered that the parties cooperate in the buyer's efforts to secure the liquor license transfer. In short, nothing in that judgment contravenes or otherwise limits the legislative command that only "the director or other issuing authority, as the case may be, may transfer any [liquor] license issued by him or it respectively to the applicant for transfer[.]" *N.J.S.A.* 33:1–26.

That said, we acknowledge that, even after cooperating in good faith, the parties nevertheless may be unable to secure the governmental approvals needed to secure the transfer of the liquor license. Because the contract at issue does not recite a separate consideration for the liquor license or otherwise provide for its severability, the inability to transfer that license may confound or defeat the contract's purpose. In that event, nothing in this opinion shall be read or construed to limit the Chancery court's authority to invoke the contract doctrines of novation, *see Sixteenth Ward Bldg. & Loan Ass'n v. Reliable Loan*, 125 *N.J. Eq.* 340, 342–43, 5 *A.*2d 753 (E. & A.1939), impossibility of performance, *see Duff v. Trenton Beverage Co.*, 4 *N.J.* 595, 605–06, 73 *A.*2d 578 (1950), or the like, or its inherent equitable power to adjust any of the terms or conditions of the contract.

## IV.

The judgment of the Appellate Division is reversed, the judgment of the Chancery court is reinstated, and the case is remanded to the Appellate Division for consideration of the remaining arguments advanced by the parties on the appeal and the cross-appeal.

*For reversal, reinstatement and remandment*—CHIEF JUSTICE RABNER and JUSTICES LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.