NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet this opinion is only binding on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-3911-15T1

SUMMIT RESOURCES GROUP, INC.,

 Plaintiff-Appellant,

v.

MERCER GROUP INTERNATIONAL
OF NEW JERSEY, INC.1 and
FAIRLESS IRON & METAL, LLC,

 Defendants-Respondents,

and

SIMS METAL MANAGEMENT, LLC, and
SIMS METAL EAST, LLC,

 Defendants.
————————————————————————————————————-

 Argued May 18, 2017 – Decided July 10, 2017

 Before Judges Hoffman and Whipple.

 On appeal from Superior Court of New Jersey,
 Law Division, Mercer County, Docket No. L-
 1430-13.

 Michael Confusione argued the cause for
 appellant (Hegge & Confusione, LLC, attorneys;
 Mr. Confusione, of counsel and on the briefs).

1
 Improperly pled as Mercer Group International.
 Lewis J. Pepperman argued the cause for
 respondents (Stark & Stark, attorneys; Bryan
 M. Buffalino, of counsel and on the brief).

PER CURIAM

 Plaintiff Summit Resources Group, Inc. (Summit) appeals from

a February 22, 2016 Law Division order granting partial summary

judgment in favor of defendants Mercer Group International of New

Jersey, Inc. (Mercer) and Fairless Iron & Metal, LLC (Fairless).

Summit also appeals from an April 15, 2016 Law Division order

granting defendants' motion for reconsideration and dismissing

Summit's complaint in its entirety. This dispute arose from a

contract between Summit and Mercer, which guaranteed Summit

commission payments from an arrangement it brokered between Mercer

and a third party for the delivery of scrap metals. For the

reasons that follow, we reject Summit's arguments and affirm.

 I.

 We discern the following facts from the record, viewed in the

light most favorable to Summit, the non-moving party. See Davis

v. Brickman Landscaping, Ltd., 219 N.J. 395, 405-06 (2014). Summit

is a broker that identifies sources of steel and other metals and

markets the products to buyers. Through its owner, E. Dennis

Matecun, Jr., Summit developed a relationship with Covanta Energy

Corporation (Covanta). Covanta's business involves converting

 2 A-3911-15T1
municipal solid waste into renewable energy and removing certain

metals in the process.

 According to Thomas Mazza, an officer of both Mercer and

Fairless, Mercer is a New Jersey corporation that "owns and

operates a solid waste, construction and demolition debris, and

materials recovery facility/transfer station in Trenton." Prior

to 2007, Mercer was engaged in the business of scrap metal

recycling and processing. Mercer transitioned this business to

Fairless, its affiliate, sometime in early 2007. Fairless also

engaged in the business of scrap metal recycling from October 2006

to July 2009.

 In 2006, Matecun discussed a business opportunity with Mazza

where defendants would purchase scrap metal from Covanta. Covanta

requested Summit structure the contracts for sale to ensure they

were between Covanta and Mercer or Fairless, with Summit receiving

commission as the broker.

 On October 25, 2006, Matecun sent Mazza a one-page document

titled "Commission Agreement for Municipal Scrap and White

Goods/Misc. Scrap" (Commission Agreement). After making hand-

written alterations, Mazza returned the signed document to Summit.

The Commission Agreement stated as follows, in relevant part:

 Tom [Mazza] – I'm writing to confirm our
 commission agreement for Summit Resources
 Group for the Covanta Energy scrap metal that
 you've been awarded, and eventually for
 3 A-3911-15T1
 additional facilities such as Union and Newark
 when we succeed in getting them:

  Summit Resources Group will receive a fee
 of $5 per gross ton U.S. funds from
 Mercer beginning November 1st, 2006, for
 each ton of raw material . . . shipped
 from Covanta's Delaware Valley and
 Hempstead plants to/through your
 companies.

  The commission will be paid once monthly,
 on or before the 15th of the month for
 all scrap shipped during the previous
 month . . . .

  This relationship between Mercer and
 Summit regarding commission/consulting
 for these plants will last as long as
 Mercer, their related companies, or any
 purchaser of Mercer or related companies
 receives scrap metal from these plants.

  Sale of Mercer, or sale/transfer of these
 scrap accounts by Mercer does NOT void
 the above commission agreement/fees.

 Between November 1, 2006, and August 1, 2007, Covanta awarded

Fairless five separate contracts for the purchase of Ferrous

Materials from Covanta plants (Covanta Contracts). Fairless paid

commissions to Summit of $5 per gross ton for four of these

contracts, as required by the Commission Agreement. For the fifth

contract, Fairless paid Summit $3 per gross ton. Fairless

continued to pay commissions to Summit through the beginning of

2009.

 4 A-3911-15T1
 However, on July 2, 2009, Fairless entered into an "Asset

Purchase Agreement" (APA) with Simsmetal East, LLC (Sims), a

Delaware company engaged in the scrap metal business. Sims agreed

to purchase certain assets from Fairless, and the agreement listed

Sims as the "Purchaser." As part of this transaction, Sims

employed Mazza as a "general manager" beginning on or about July

2, where he remained until May 2, 2013. Defendants assert that

following this sale, Fairless continued to exist as an entity, but

it ceased all scrap recycling operations.

 The APA contained a section titled "Certain Included

Contracts," which listed the contracts Fairless was assigning to

Sims. The Covanta Contracts were initially included in this

section; however, according to Mazza, they were removed from the

APA in August 2009. Instead, Sims and Covanta executed "new"

agreements, beginning October 1, 2009, whereby Covanta agreed to

sell scrap metal to Sims. Summit disputes whether these agreements

constituted "new" contracts, claiming the parties simply changed

the name on the existing Covanta Contracts from Fairless to Sims.

Fairless disclosed the Commission Agreement to Sims prior to the

asset sale, but the parties did not list it as an included contract

in the APA.

 Following the execution of the APA in July 2009, Fairless

ceased purchasing scrap metal from Covanta. On July 11, 2009,

 5 A-3911-15T1
Mazza informed Matecun the Commission Agreement was no longer in

effect, and Fairless no longer existed. Instead, Sims purchased

over 400,000 tons of scrap metal from Covanta beginning in July

2009, for which Summit did not receive commissions.

 In 2013, Summit filed a complaint against Mercer, Fairless,

and Sims, asserting in count one that defendants breached the

Commission Agreement by failing to pay commissions owed to Summit.

In counts two through five, Summit alleged wrongful interference

with contract, unjust enrichment, and sought a declaratory

judgment stating the Commission Agreement remained valid and

binding.

 In October 2013, Summit and Sims entered into a stipulation

of dismissal, whereby Summit dismissed its suit against Sims

without prejudice. In 2015, Mercer and Fairless filed a motion

for summary judgment, contending that under the Commission

Agreement, Sims was not a "purchaser" of Fairless, a "related

compan[y]" of Mercer, because Sims only purchased certain assets

from Fairless. As these assets did not include the Commission

Agreement or Covanta Contracts, and defendants ceased receiving

scrap shipments in July 2009, the Commission Agreement effectively

terminated in July 2009 following the asset sale. In response,

Summit contended Sims fell within the definition of "purchaser"

due to its acquisition of Fairless' assets. Summit further argued

 6 A-3911-15T1
that at a minimum, this provision was ambiguous, requiring

resolution by a jury to determine what the parties meant by

"purchaser." Summit pointed to the APA and a 2010 indemnity

agreement between Sims and Fairless, both of which identified Sims

as the "Purchaser."

 On January 8, 2016, after oral argument, the motion judge

dismissed counts two through five of Summit's complaint and granted

partial summary judgment on count one in favor of defendants. On

count one, the judge found that because Sims only purchased the

assets of Fairless and not the entity, "Sims [was] not a purchaser

of Mercer or Fairless as the term purchaser was used in the

[Commission Agreement,] and [d]efendants therefore are not liable

for commissions on scrap metal purchased by Sims."

 The judge denied full summary judgment, however, because he

found an issue of fact as to whether defendants purchased scrap

metal from Covanta from July 2009 to December 2009. This issue

arose because Covanta erroneously credited certain payments from

Sims as being from Fairless. Defendants moved for reconsideration

and provided documents showing Fairless did not pay Covanta for

scrap metal after July 2009. Summit did not dispute the new

documentation but reiterated its opposition to summary judgment.

 The motion judge then granted reconsideration and dismissed

Summit's complaint in its entirety. This appeal followed.

 7 A-3911-15T1
 II.

 We "review the trial court's grant of summary judgment de

novo under the same standard as the trial court," and we accord

"no special deference to the legal determinations of the trial

court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co.

of Pittsburgh, 224 N.J. 189, 199 (2016). Pursuant to this

standard, we must grant summary judgment "if the pleadings,

depositions, answers to interrogatories and admissions on file,

together with the affidavits, if any, show that there is no genuine

issue as to any material fact challenged and that the moving party

is entitled to a judgment or order as a matter of law." Ibid.

(quoting R. 4:46-2(c)).

 If no genuine issue of material fact is present, we focus our

review on the legal interpretations of the trial judge. DepoLink

Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super.

325, 333 (App. Div. 2013). We review issues of law de novo and

accord no deference to the trial judge's legal conclusions.

Nicholas v. Mynster, 213 N.J. 463, 478 (2013). Contractual

interpretation is a legal matter ordinarily suitable for

resolution on summary judgment. Celanese Ltd. v. Essex Cty.

Improvement Auth., 404 N.J. Super. 514, 528 (App. Div. 2009).

"When a trial court's decision turns on its construction of a

 8 A-3911-15T1
contract, appellate review of that determination is de novo."

Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014).

 We are obligated to read contracts "as a whole in a fair and

common sense manner." Id. at 118 (quoting Hardy ex rel. Dowdell

v. Abdul-Matin, 198 N.J. 95, 103 (2009)). "The polestar of

contract construction is to discover the intention of the parties

as revealed by the language used by them." Karl's Sales & Serv.,

Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 492 (App. Div.),

certif. denied, 127 N.J. 548 (1991). Our review focuses upon "the

intention of the parties to the contract as revealed by the

language used, taken as an entirety; and, in the quest for the

intention, the situation of the parties, the attendant

circumstances, and the objects they were thereby striving to

attain." Lederman v. Prudential Life Ins. Co. of Am., Inc., 385

N.J. Super. 324, 339 (App. Div.) (quoting Biovail Corp. Int'l v.

Hoechst Aktiengesellschaft, 49 F. Supp. 2d 750, 774 (D.N.J. 1999)),

certif. denied, 188 N.J. 353 (2006).

 If a contract can be construed according to its plain

language, then that language governs. Twp. of White v. Castle

Ridge Dev. Corp., 419 N.J. Super. 68, 74-75 (App. Div. 2011).

"However, 'where there is uncertainty, ambiguity or the need for

parol evidence in aid of interpretation, then the doubtful

provision should be left to the jury.'" Driscoll Constr. Co.,

 9 A-3911-15T1
Inc. v. State, 371 N.J. Super. 304, 314 (App. Div. 2004) (quoting

Great Atl. & Pac. Tea Co., Inc. v. Checchio, 335 N.J. Super. 495,

502 (App. Div. 2000)). Ambiguity exists where the terms "are

susceptible to at least two reasonable alternative

interpretations." M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171

N.J. 378, 396 (2002) (quoting Nester v. O'Donnell, 301 N.J. Super.

198, 210 (App. Div. 1997)). Nonetheless, we construe ambiguous

provisions against the drafter of the contract. Kotkin v. Aronson,

175 N.J. 453, 455 (2003).

 Summit urges reversal, arguing the motion judge erred as a

matter of law because the plain language of the Commission

Agreement required defendants to continue paying commission to

Summit. Summit further contends even if the Commission Agreement

was not clear and unambiguous in favor of its position, it was not

clear and unambiguous in favor of defendants; therefore, we should

remand for a jury determination. Essentially, Summit contends the

Commission Agreement guaranteed it commission from Mercer so long

as Sims, as a "purchaser" of Fairless, received scrap metals from

Covanta.

 In support of this position, Summit argues that contrary to

the motion judge's determination, Sims was a "purchaser" of

Fairless as defined in the third bullet point of the Commission

Agreement. Summit contends the motion judge erred because the

 10 A-3911-15T1
Commission Agreement does not distinguish between "a sale of

Fairless the company" and "a sale of Fairless' assets." Summit

further asserts that the reference to "your companies" in the

first bullet point included asset purchasers such as Sims,

especially here, where Sims "simply continued carrying on

Fairless' business." Last, Summit argues the language from the

fourth bullet point, "Sale of Mercer, or sale/transfer of these

scrap accounts by Mercer does NOT void the above commission

agreement/fees," shows defendants were bound to continue

commission payments to Summit after the Fairless sale.

 Having reviewed the language of the Commission Agreement, we

reject Summit's arguments and affirm. First, we have noted that

selling a "company" as opposed to its "assets" are two different

concepts. See Woodrick v. Jack J. Burke Real Estate, Inc., 306

N.J. Super. 61, 74 (App. Div. 1997) ("[T]he crucial inquiry is

whether there was an intent on the part of the contracting parties

to effectuate a merger or consolidation rather than a sale of

assets." (quoting Glynwed, Inc. v. Plastimatic, Inc., 869 F. Supp.

265, 276 (D.N.J. 1994))), appeal dismissed, 157 N.J. 537 (1998).

Summit argues the absence of this distinction shows the parties

intended the phrase "purchaser" to cover both types of

transactions. However, construing the contract against Summit as

the drafter, we find Summit's failure to make this distinction

 11 A-3911-15T1
fatal to its argument. See Kotkin, supra, 175 N.J. at 455. The

motion judge did not err by concluding, because the asset sale did

not qualify Sims as a "purchaser of Mercer or related companies,"

the relationship between defendants and Summit had terminated.

 We further find the clear language from the first bullet

point of the Commission Agreement defeats Summit's argument. This

section guaranteed Summit a fee from Mercer "for each ton of raw

material . . . shipped from Covanta's Delaware Valley and Hempstead

plants to/through your companies." Contrary to Summit's claims,

no reasonable construction of this agreement could define Sims as

one of Mercer's "companies." As such, once Sims began receiving

scrap metal from Covanta instead of Fairless,2 defendants were no

longer bound to pay commission fees to Summit.

 For similar reasons, we reject Summit's argument that the

fourth bullet point is dispositive. This provision stated that a

"[s]ale of Mercer" does not void the agreement, but that did not

occur here. Furthermore, while it also stated a "sale/transfer

of these scrap accounts" would not void the Agreement, it is clear

that, after the APA, neither Mercer companies nor a "purchaser of

Mercer or related companies" continued to receive scrap metal.

2
 Sims utilized Fairless' recycling operating system for a
transition period following the closing of the asset sale.
However, Sims paid for these purchases from Covanta.
 12 A-3911-15T1
Therefore, we agree with the motion judge that the Commission

Agreement was no longer in effect after July 2009.

 Finally, as noted by the motion judge in his oral decision,

Summit's position is "inequitable" because it would require

defendants to pay Summit commission for scrap metal they no longer

receive, for the indefinite period Sims and Covanta choose to

maintain their relationship. "Perpetual contractual performance

is not favored in the law and is to be avoided unless there is a

clear manifestation that the parties intended it." In re Estate

of Miller, 90 N.J. 210, 218 (1982). Because we find parties did

not clearly intend such a result, we discern no basis to disturb

the decision of the motion judge.

 III.

 Summit also argues defendants breached the covenant of good

faith and fair dealing implied in the Commission Agreement by

endeavoring to prevent Sims from adopting the Covanta Contracts

from Fairless. We find this argument lacks merit.

 "[E]very contract in New Jersey contains an implied covenant

of good faith and fair dealing . . . ." Wood v. N.J. Mfrs. Ins.

Co., 206 N.J. 562, 577 (2011) (quoting Kalogeras v. 239 Broad

Ave., L.L.C., 202 N.J. 349, 366 (2010)). Under this doctrine,

"neither party shall do anything which will have the effect of

destroying or injuring the right of the other party to receive the

 13 A-3911-15T1
fruits of the contract." Ibid. (quoting Kalogeras, supra, 202

N.J. at 366). The covenant "cannot override an express term in a

contract," but "a party's performance under a contract may breach

that implied covenant even though that performance does not violate

a pertinent express term." Wilson v. Amerada Hess Corp., 168 N.J.

236, 244 (2001).

 Summit's argument stems from a series of emails between Mazza

and another Sims manager regarding Sims' decision not to adopt the

Covanta Contracts from Fairless, and an affidavit from a Covanta

manager stating Covanta did not believe it entered into "new"

contracts with Sims. Summit contends the evidence shows Mazza

"concocted a scheme to make it appear that the Covanta Contracts

were not transferred to Sims[]." Summit alleges that by pursuing

this action, a jury could find Mazza "was attempting to destroy

Summit's right to receive the full fruits under the Commission

agreement."

 However, as Summit admits in its brief, "whether the Covanta

Contracts were included in Sims' purchase of Fairless . . . does

not affect whether the Mercer [d]efendants remain liable for

commission payment to Sims. Mercer's liability for commissions

hinges only on whether Sims is a 'purchaser' of Fairless under the

[Commission] Agreement." Therefore, by Summit's own admission,

Mazza's actions would not have impaired Summit's right to enjoy

 14 A-3911-15T1
the "fruits" of the Commission Agreement. Wood, supra, 206 N.J.

at 577. Summit's claim for breach of good faith and fair dealing

against defendants thus lacks merit.

 Affirmed.

 15 A-3911-15T1