

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00151-CV

JOHN MCCRACKEN                                           APPELLANT

V.

MONOSOL RX, LLC                                           APPELLEE

----------

FROM THE 342ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 342-250974-11

----------

## MEMORANDUM OPINION[1]

----------

This is a breach of contract case. In April 2008, Appellant John McCracken entered into an employment agreement with Appellee MonoSol Rx, LLC. This agreement covered McCracken's eligibility for annual bonus payments, under what circumstances MonoSol would have cause to terminate

---

[1]*See* Tex. R. App. P. 47.4.

McCracken's employment, and the payment of severance if MonoSol terminated McCracken's employment for any reason other than for cause.

MonoSol fired McCracken in March 2009. MonoSol did not pay McCracken severance or a bonus. McCracken sued MonoSol for breach of contract to recover the severance, a bonus payment for 2008, and prorated bonus payment for 2009. The trial court granted summary judgment for MonoSol.

In this appeal, McCracken asserts in four issues that the trial court erred by granting summary judgment on his claims for severance and bonus payments, by overruling his objections to MonoSol's evidence, and by granting summary judgment on his claim for statutory attorney's fees. Because we hold that McCracken raised a fact question on each of MonoSol's summary judgment grounds, we reverse.

## 1. Background

MonoSol produces dissolvable film onto which prescription and over-the-counter drugs can be incorporated. Keith Kendall is MonoSol's chief financial officer, and Mark Schobel is MonoSol's president and CEO.

MonoSol hired McCracken as senior vice president for business development and licensing. The parties signed an employment agreement with a two-year term. The agreement contained a provision for an annual bonus of forty percent of McCracken's salary upon the occurrence of certain specified conditions. If MonoSol terminated McCracken's employment for cause,

2

McCracken would receive only accrued compensation and benefits. But if MonoSol terminated McCracken's employment without cause, he would receive severance payments for twelve months. The agreement's definition of "cause" included the "failure of [McCracken] to perform his duties, including, without limitation, [McCracken]'s failure or refusal to follow the legitimate directions of the Company and/or of any of the persons to whom [McCracken] reports."

On February 4, 2009, Kendall gave McCracken a "Cause Notice Period" letter (cause notice) stating, "There continues to be concern about your ability to successfully perform the responsibilities required of you." Accordingly, MonoSol was giving McCracken "a 30 day 'Cause Notice Period' as outlined by [McCracken's] employment contract." The letter contained the following list of objectives that McCracken needed to accomplish:

- Provide strategic direction and a selection process for SFI [self-funded initiative] candidates[2] and partnership targets[;]

- Create and execute a business development/relationship strategy for targeted potential partners[;]

- Demonstrate capability to own, direct[,] and execute establishing and binding strategic relationships[;]

- Own, follow up[,] and follow through on partnership activities[;]

- Demonstrate a viable group of active potential partnership opportunities that will satisfy revenue goals and are consistent with the strategic direction of the company[; and]

---

[2]Self-funded initiatives are drugs for which MonoSol invests its own money to fund the product's development and partners with a pharmaceutical company for sales and distribution of the drug.

- Participate fully as a member of the leadership team of the company[.]

The letter did not elaborate on what these objectives involved or set out any objective standards for measuring McCracken's performance of them. The letter gave McCracken thirty days to "attain an acceptable level of performance" and stated that if he did not do so, his employment would be terminated on March 6, 2009. On March 5, Kendall gave McCracken a letter terminating his employment as of March 6.

McCracken sued MonoSol for breach of contract, alleging that MonoSol fired him without cause and then failed to give him severance pay. McCracken further asserted that even if MonoSol had cause to terminate his employment, MonoSol breached the agreement by failing to provide him with an adequate cure notice and period to correct deficiencies. McCracken also claimed that he accrued but was not paid his 2008 bonus and a prorated bonus for the first quarter of 2009.

McCracken asserted that New Jersey law should apply and that under New Jersey law, a duty of good faith and fair dealing is implied in employment contracts. He claimed that MonoSol breached this duty when it failed to timely disclose "established performance targets" for purposes of his bonus, failed to pay his bonus, failed to give him proper notice and an opportunity to cure any deficiencies in his work performance, and falsely claimed that his termination was for cause.

MonoSol filed a response and a fifty-three page combined no-evidence and traditional motion for summary judgment. MonoSol asserted that its business model depends on identifying drugs that will likely sell well and that have the right attributes for incorporation onto the film, and then persuading those companies to partner with MonoSol; that it had hired McCracken to develop methods by which MonoSol could identify the optimal drugs and pharmaceutical companies to target its marketing and which drugs were "non-optimal targets"; and that McCracken failed to perform his job duties.

McCracken filed a response and objections to some of MonoSol's summary judgment evidence. The trial court overruled McCracken's objections and granted MonoSol's motion without specifying the grounds for judgment. McCracken now appeals.

## 2. Standard of Review

We review a summary judgment de novo.[3] We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not.[4] We indulge every reasonable inference and resolve any doubts in the nonmovant's favor.[5] A

---

[3] *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

[4] *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

[5] *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim.[6]

When a party moves for summary judgment under both rules 166a(c) and 166a(i), we will first review the trial court's judgment under the standards of rule 166a(i).[7] When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, and, as when reviewing traditional summary judgment, we indulge every reasonable inference and resolve any doubts against the motion.[8] We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not.[9] If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper.[10]

---

[6] *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).

[7] *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).

[8] *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006).

[9] *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009) (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)).

[10] *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004).

## 3. Analysis

*3.1. McCracken's breach of contract claim based on failure to pay severance: the no-evidence summary judgment grounds.*

We begin with McCracken's second issue, in which he contends that the trial court improperly granted summary judgment on his claim to recover severance payments. McCracken claimed that MonoSol breached the employment agreement three different ways when it failed to pay him severance. First, he alleged that MonoSol did not have cause to fire him. Because the firing was without cause, MonoSol had to pay him severance under the agreement.

Second, he argued that even if MonoSol had cause, MonoSol did not follow the steps that had to be taken under the agreement's notice-and-cure provision before MonoSol could fire him for cause. He alleged that it did not substantively comply because it did not contain a statement of the evidence on which the determination of cause was based and that it did not comply procedurally because he did not receive the full notice period required by the agreement. Thus, he argued, his firing had to be considered an involuntary termination, thereby triggering the severance payments.

Third, McCracken alleged that in addition to MonoSol's breach of express provisions of the employment agreement, it also breached an implied duty of good faith and fair dealing. He claimed that MonoSol breached this implied duty by failing to give him proper notice of cause for termination and an opportunity to cure and by falsely claiming that his termination was for cause. Under this issue,

7

then, we consider MonoSol's summary judgment grounds addressing and the evidence relevant to whether MonoSol had cause to fire McCracken, whether it complied with the agreement's notice provision such that the firing could be classified as for cause, and whether it acted in bad faith in firing him.

*3.1.1. MonoSol's no-evidence summary judgment grounds relating to cause for termination.*

MonoSol's no-evidence motion addressed each of McCracken's allegations about its failure to pay him severance. Regarding the cause determination, it asserted (1) that there was no evidence that it fired McCracken without cause; (2) that there was no evidence that it breached the implied covenant of good faith because there was no evidence that it took any acts not governed by the agreement that damaged McCracken; (3) that there was no evidence that McCracken performed all his duties; and (4) that there was no evidence that the cause determination was made in bad faith. McCracken's response addressed each of these no-evidence grounds.

*Whether MonoSol had cause to fire McCracken*

We turn first to the question of whether McCracken produced evidence raising a fact issue about whether MonoSol had cause to fire him. To raise a fact issue on this ground, McCracken's summary judgment response relied on his own affidavit and several attached exhibits.

In his affidavit, he stated that he met regularly with Kendall; that in the meetings, they discussed key projects and top priorities; and that he diligently

8

executed those priorities. He engaged in business development activities such as making telephone calls and sending emails to promote MonoSol's products and product development capabilities, and he also had face-to-face meetings as listed on an attached spreadsheet. The spreadsheet showed multiple meetings almost every month of McCracken's employment at MonoSol.

The affidavit stated that when Kendall expressed concerns about McCracken's performance, McCracken asked him questions to try to understand Kendall's specific concerns. Rather than providing those specifics, Kendall told him, "I can't fire you because I don't like you or the way you dress." When McCracken again tried to elicit information about his performance problems after he had been given the cause notice, Kendall told him, "You are an executive, you figure it out." And he averred that halfway through the cure period, Kendall told him that "there would not be 'good news' on March 6th (the end of the 'cure' period), [and] that [McCracken] would not be able to 'turn it around.'"

McCracken averred that all employees were required to do a self-assessment as part of their performance management process. He attached an email that the vice president of human resources had sent to company managers stating that employees would need to complete a self-assessment. The email stated that this self-assessment would be needed by managers in "work[ing] through the process of doing evaluations." McCracken attached his two-page self-assessment to his response. The assessment listed his actions regarding key projects and discussed steps taken in contribution to the business as a

9

whole. McCracken offered to review that self-assessment with Kendall, but Kendall declined.

McCracken further asserted in his response and affidavit that he had been told that new SFI projects were on hold for financial reasons and that before he received his cause notice, Kendall never rescinded that earlier instruction. This is some evidence disputing the statements in his notice that he was deficient in "[d]emonstrating a viable group of active potential partnership opportunities" and in "[p]rovid[ing] strategic direction and a selection process for SFI candidates and partnership targets." If McCracken had been told to put new projects on hold, he could not in good faith be found to be deficient for failing to pursue new projects.

Furthermore, McCracken stated in his affidavit that although he had been told to put new projects on hold, in the fall of 2008, he had nevertheless started discussing SFI initiatives again in the hopes that MonoSol could afford to restart the program in 2009, which is evidence that he was working on this duty even though he had been told it was not a priority. He also stated that the SFI team was composed of members from several MonoSol functions, yet to his knowledge no other team members had been disciplined for their involvement on the team.

McCracken further stated in his affidavit that "[b]ased on [his] experience and knowledge of the industry, [he] fully performed [his] duties" under the employment agreement. He "diligently sought to expend the business development opportunities" of MonoSol. He stated that he was "principally in

10

charge of negotiating" a deal with KemPharm, a deal that MonoSol promoted on its website "as a major deal," and he was "instrumental in negotiating a smaller international deal with Hikma." He also arranged to speak at an industry conference to further publicize MonoSol's product.

McCracken further asserted that he has more pharmaceutical business development experience in the industry than Schobel or Kendall. He asserted in his response and affidavit that the limited number of deals he completed while at MonoSol was attributable to the nature of the industry, in which deals typically require six to nine months to mature.

McCracken further stated that before receiving the cause notice, there were no prior occasions in which Schobel or Kendall requested strategic direction review, "as [his] priority was to create business development value." But nevertheless, after receiving the notice, he attempted to cure what he had been told in the notice was a deficiency in his performance. He prepared a presentation (which he attached to his affidavit) to review strategy and discuss new product opportunities. He also continued his work at SFI meetings, presented a list of "viable targets," participated fully at leadership team meetings, and continued work on finalizing the KenPharm relationship.

McCracken also stated in his affidavit that MonoSol had funding problems while he worked there, to the extent that the company announced a hiring freeze in the fall of 2008. In support of his statements, he attached the minutes from an October 2008 leadership team meeting.

The evidence produced by McCracken, viewed in the light most favorable to him,[11] is some evidence that when MonoSol gave McCracken the cause notice, he had been performing his job duties, that Kendall did not like him and wanted to fire him for reasons unrelated to his performance, and that Kendall was not willing to objectively evaluate McCracken or help him improve his performance. This evidence raises a fact question about whether McCracken was fired for cause and thus whether MonoSol breached the express term of the employment agreement when it did not pay him severance. Accordingly, the trial court should not have granted no-evidence summary judgment for MonoSol on McCracken's severance claim on the ground that McCracken was fired for cause.

*New Jersey contract law and whether MonoSol acted in bad faith regarding McCracken's attempt to cure*

We next consider McCracken's evidence relating to whether, if MonoSol did have cause to fire McCracken, it acted in bad faith with respect to his efforts to cure his performance deficiencies. McCracken alleged that MonoSol breached an implied term of good faith because it did not give him a fair opportunity to cure any deficiencies in his performance. MonoSol argued in its motion that there was no evidence that it breached the implied covenant of good faith because that claim cannot be based on any acts governed by the agreement, and there was no evidence that MonoSol did anything with respect to

---

[11]*See Sudan*, 199 S.W.3d at 292.

12

McCracken's employment that was not governed by the agreement. We therefore must first look at what New Jersey law says about the implied covenant of good faith.

*New Jersey law on implied covenants*

In New Jersey, every contract contains an implied term of good faith and fair dealing.[12] The implied covenant of good faith means that "'neither party shall do anything [that] will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"[13]

While this implied covenant does not override the agreement's express terms, a party may perform the contract in a manner that breaches the implied covenant even though it complies with the contract's express terms.[14] Accordingly, "'a party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations even when it exercises an express and unconditional right to terminate.'"[15]

Under New Jersey law, a plaintiff may not recover on both a claim that some act of the defendant breached the implied covenant and a separate claim

---

[12] *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (2001).

[13] *Wood v. New Jersey Mfrs. Ins. Co.*, 21 A.3d 1131, 1140 (2011) (quoting *Kalogeras v. 239 Broad Ave., L.L.C.*, 997 A.2d 943 (2010)).

[14] *Wilson*, 773 A.2d at 1126.

[15] *Id.* (quoting *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 575 (1997)).

that the act breached an express term of the agreement. For that reason, if a factfinder determines that an act of the defendant has breached an express term, it should not then be asked if the same act further constitutes a breach of the implied covenant.[16] A plaintiff may, however, plead alternative claims of both breach of the express terms of the contract and breach of the implied covenant,[17] as McCracken did in this case.

MonoSol asserts that under the New Jersey case *Wade v. Kessler Institute*, a plaintiff may assert an implied covenant claim based on an employment contract only when the employer complies with the contract and *also* engages in some act outside of or not governed by the contract that deprives the employee of the expectation arising from the contract. We agree that under *Wade*, an implied covenant claim cannot be sustained once the factfinder finds a breach of the contract's express terms. But we disagree with MonoSol to the extent that it may be arguing that under *Wade*, if it followed the employment agreement's express terms regarding McCracken's termination and took no step that was not in compliance with the agreement's literal terms, it cannot be liable for a breach of the implied covenant.

MonoSol also argues that under *Wade*, an implied covenant claim cannot require interpretation of an express term of the agreement. *Wade* does not

---

[16]*Wade v. Kessler Inst.*, 798 A.2d 1251, 1262 (2002).

[17]*Id.* at 1263.

contain language to that effect.  And we decline to read *Wade* as concluding that if a court must interpret a term in order to determine the defendant's liability, then the plaintiff is really asserting a breach of that express term, and therefore the plaintiff may not raise a claim based on the implied covenant.  Contract terms may need to be interpreted in an implied covenant claim, for example, in order to ascertain the intent of the parties.[18]

We do agree that if a plaintiff asks the court to interpret an express term of the contract in order to find that the defendant breached that term, then the plaintiff's claim is not for breach of the implied covenant—with the caveat, of course, that the plaintiff may plead in the alternative, as McCracken did in this case.

*Applying New Jersey law to the facts of this case*

The evidence produced by McCracken was sufficient to raise a question of fact about whether MonoSol acted in good faith with respect to McCracken's

---

[18] *See Wilson*, 773 A.2d at 1130.  The *Wilson* court stated that in considering the claim for breach of the implied covenant, "the parties' bargain as expressed in the contract" must be respected and that it is a breach of the implied covenant for a party to use discretionary authority given to it in a contract to set prices "if that party exercises its discretionary authority . . . with the objective of preventing the other party from receiving its reasonably expected fruits under the contract" because

> [s]uch risks clearly would be beyond the expectations of the parties at the formation of a contract when parties reasonably intend their business relationship to be mutually beneficial.  They do not reasonably intend that one party would use the powers bestowed on it to destroy unilaterally the other's expectations without legitimate purpose.

15

opportunity to cure. The deficiencies listed in the cause notice did not include objectively measurable performance metrics. When McCracken produced evidence that when he asked for a better explanation about what he needed to do to cure, Kendall refused to elaborate. McCracken was told that one of his deficiencies was that he had failed to do work relating to SFIs, but he produced evidence that he had been told to put those projects on hold. He produced evidence that Kendall did not like him, that Kendall had made up his mind by mid-February that McCracken would be terminated at the end of the cure period regardless of his performance during the rest of the cure period, and that MonoSol had funding problems resulting in its putting SFI projects on hold, suggesting that it would be in MonoSol's interest to find a way to avoid paying McCracken severance.

This evidence is some evidence that even if MonoSol had cause to determine that McCracken had not been adequately performing his job duties, it acted in bad faith by depriving him of an opportunity to cure, thereby depriving him of the right to receive the fruits of the employment agreement.[19] We sustain this part of McCracken's second issue.

*3.1.2. The contents of the cause notice and the length of the cure period: the no-evidence summary judgment grounds.*

McCracken alleged that MonoSol breached the employment agreement by not including in the cause notice a description of the evidence on which MonoSol

---

[19]*See Wood*, 21 A.3d at 1140.

relied in making its cause determination, as was required by the agreement. He also alleged that he was not giving a full opportunity to cure.

MonoSol asserted as a no-evidence ground that there was no evidence that its cause notice failed to comply with the employment agreement. It also asserted that there was no evidence that it failed to give McCracken the full cure period required by the agreement.

On appeal, McCracken argues that he produced sufficient evidence to raise a fact issue on these grounds. But if MonoSol had no cause to terminate McCracken's employment, then it breached the agreement, regardless of whether MonoSol's notice letter and cure period met the technical letter of the agreement. Accordingly, because we have held that McCracken produced sufficient evidence to defeat MonoSol's right to no-evidence summary judgment on the question of whether it had cause to fire him and whether it acted in good faith regarding his efforts to cure any deficiencies, we do not need to address this part of McCracken's second issue.

### 3.1.3. Other no-evidence grounds

We now address MonoSol's inclusion in its no-evidence summary judgment motion of grounds based not on an alleged lack of evidence to support an element of McCracken's claims but on grounds that McCracken's claims were barred on pure legal grounds.

A no-evidence motion is a proper vehicle for obtaining judgment on a claim that would generally involve a question of fact but, due to a lack of evidence, the

trial court can determine the issue as a matter of law.[20]   But it is an unsettled question in Texas as to whether a no-evidence summary judgment may be based, not on a lack of evidence, but instead on a pure question of law, such as the interpretation of an unambiguous contract or a statute.  Because such a case turns solely on the trial court's interpretation of the contract or statute at issue, which is a question of law, no evidence presented by the nonmovant will affect the trial court's determination of the movant's right to summary judgment.[21]   The question of whether a no-evidence summary judgment motion may be based on pure questions of law is one on which courts of appeals disagree.[22]

---

[20]*See Park v. Mem'l Health Sys. of E. Tex.*, 397 S.W.3d 283, 293 (Tex. App.—Tyler 2013, pet. denied) (citing Tex. R. Civ. P. 166a(i) and holding that "[b]ecause there is no evidence that Memorial's actions caused Park's damages, Memorial is entitled to summary judgment as a matter of law on Park's tort causes of action"); *Dennis v. Giles Group, Inc.*, No. 04-07-00280-CV, 2008 WL 183062, at *6 (Tex. App.—San Antonio Jan. 23, 2008, no pet.) (mem. op.) ("In a no-evidence motion for summary judgment, the movant must identify which element of the plaintiff's claim is legally insufficient as a matter of law.").

[21]*See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 214 (Tex. 2011) ("Where an ambiguity has not been raised by the parties, the interpretation of a contract is a question of law."); *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 683 (Tex. 2007) ("Statutory construction is a legal question that we review de novo, ascertaining and giving effect to the Legislature's intent as expressed by the plain and common meaning of the statute's words.").

[22]*Compare Franks v. Roades*, 310 S.W.3d 615, 621–22 (Tex. App.—Corpus Christi 2010, no pet.); *In re Estate of Allen*, 301 S.W.3d 923, 929 (Tex. App.—Tyler 2009, pet. denied); *Harrill v. A.J.'s Wrecker Serv., Inc.*, 27 S.W.3d 191, 194 (Tex. App.—Dallas 2000, pet. dism'd) (all holding that no-evidence motions may not be based on questions of law), *with Means v. ABCABCO, Inc.*, 315 S.W.3d 209, 211 (Tex. App.—Austin 2010, no pet.) (holding that no-evidence motions may be based on questions of law).

The applicable rule of civil procedure provides,

> After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that *there is no evidence* of one or more *essential elements* of a claim or defense on which an adverse party *would have the burden of proof at trial.* The motion must state the elements as to which there is no evidence. The court must grant the motion *unless the respondent produces summary judgment evidence* raising a genuine issue of material fact.[23]

The rule's language presupposes that the motion allowed under that part of the rule is one that is directed at an element of a claim or defense and that the element is one for which the nomovant would have the burden of producing evidence at trial in order to prevail. The language of the rule excludes from its inclusion a ground for which there could never be an issue of fact—that is, one that would be resolved based purely and solely on a question of law. For example, a no-evidence ground based entirely on the interpretation of a statute could not be defeated by any evidence produced by the nonmovant because evidence would not be considered by the court in deciding that question of law. At the same time, the nonmovant has no way under the rule—which mandates that the nonmovant either produce evidence raising a fact issue or lose—to defeat the movant's right to judgment. Thus, the plain language of the rule suggests that it is not intended to be used for pure matter of law grounds.

We agree with the Dallas, Corpus Christi, and Tyler courts of appeals that a no-evidence motion is not the appropriate vehicle to assert a matter-of-law

---

[23]Tex. R. Civ. P. 166a(i) (emphasis added).

19

summary judgment ground. Under the plain language of this rule, this type of motion must be based on an alleged lack of evidence, and its refutation must be based on the existence of evidence. Accordingly, the trial court should not have granted no-evidence summary judgment on the matter-of-law grounds asserted by MonoSol in its no-evidence motion. We sustain McCracken's second issue as to MonoSol's no-evidence motion.

*3.1.4. For-cause determination: the traditional summary judgment grounds.*

To be entitled to traditional summary judgment on McCracken's claim for severance, MonoSol had to establish as a matter of law (1) that McCracken did not perform his duties and thus MonoSol had cause to terminate his employment; (2) that it gave him the notice required by the employment agreement for termination for cause; and (3) that McCracken failed to cure that cause within the thirty-day cure period provided by the agreement. We begin by looking at the summary judgment evidence that MonoSol relied on below to establish that McCracken did not perform his duties.

MonoSol did not specify in this section of its motion what evidence showed that McCracken did not perform his regular job duties.[24] But in the fact section of

---

[24] *See Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 81 (Tex. 1989) (stating that a summary judgment motion is insufficient if it makes only a general reference to a voluminous record that "does not direct the trial court and parties to the evidence on which the movant relies"); *Boeker v. Syptak*, 916 S.W.2d 59, 61 (Tex. App.—Houston [1st Dist.] 1996, no writ) ("A party must expressly and specifically identify the supporting evidence on file which it seeks to have considered by the trial court").

20

its motion, it made assertions related to McCracken's job duties and performance, and it cited attached evidence to support those factual assertions. We will therefore look at the fact section of its motion for the evidence related to McCracken's job performance. In that section, MonoSol described seven areas for which it contended McCracken did not perform his duties: failure to perform significant partner support, failure to develop and execute a comprehensive marketing plan, failure in contract negotiation and administration, failure to participate on the leadership team, failure to develop and execute new methodologies regarding SFIs, failure to develop a strategy to identify potential clients, and failure to plan for achieving the 2009 revenue goal.

We examine each described performance area in turn. For each performance area, we first set out the allegations in the motion and then look at the evidence provided to support those allegations.

**(i) Failure to perform significant partner support**. The first allegation of cause we will address was an allegation that McCracken failed to provide "partner support." Neither the motion nor supporting evidence relied upon for these assertions describe what "partner support" entailed. The evidence that MonoSol cited in the fact section related to this duty was Kendall's and McCracken's deposition testimony.

Kendall stated in his deposition that because McCracken failed to provide partner support, Kendall had to do far more work than he should have had to provide that support. He also stated that McCracken "had nothing to do with"

21

some action relating to several pharmaceutical partners, but from the context, it is unclear whether he meant that McCracken had nothing to do with establishing contacts with these companies or something else. Kendall's testimony is conclusory; he made mere assertions that McCracken had failed to provide partner support without explaining what actions that duty entailed or how McCracken failed to perform those actions.

MonoSol also relied on portions of McCracken's deposition in which McCracken was asked about his role in working with four companies that had a partnership with MonoSol: BioAlliance, Kukje, Dae Woong, and APR/Labtec. When asked if Kendall "end[ed] up working on BioAlliance," McCracken answered, "He may have," and "it appears here in the notes that we were both providing comments on the term sheets, so it appears we were both working on that." When asked if he had supported Kendall in his work with Kukje, McCracken stated, "I recall reviewing the Kukje agreement and giving my comments. I don't really recall what role [Kendall] had on Kukje." Asked about whether Kendall had to do work to support a deal with Dae Woong, McCracken stated, "I don't know." Finally, regarding support to APR/Labtec, McCracken stated that he and Kendall both reviewed an agreement, both had comments on it, and "[t]here was no exclusivity on who chose to do whatever we wanted to do on that" and his understanding was "[i]t's fine if we worked as a team."

This evidence does not establish as a matter of law that McCracken failed to provide "partner support." It does not establish what McCracken's duties were

22

in providing partner support or what he failed to do as part of those duties. Furthermore, the self-assessment that McCracken completed while still at MonoSol as part of the performance review process listed actions by McCracken in working on projects with partners. Thus, McCracken produced evidence raising a fact issue about the work he did on projects with partner companies. Accordingly, the trial court could not have granted summary judgment on McCracken's claim for severance on the ground that McCracken failed to provide partner support.

**(ii) Failure to develop and execute a comprehensive marketing plan**. The next basis alleged by MonoSol of McCracken's failure to perform his job duties was that McCracken had failed to provide it with a comprehensive marketing plan. To support this allegation, MonoSol pointed to McCracken's deposition testimony, Kendall's affidavit, Schobel's affidavit, and some internal MonoSol documents. MonoSol argued that this evidence established as a matter of law that McCracken's duties included creating a comprehensive marketing plan, that McCracken failed to do so, and that he instead used the same "ad hoc activities" that MonoSol had pursued before hiring him.

The excerpt of Kendall's affidavit referenced the cure notice memorandum and stated only that Kendall had prepared the notice with knowledge of McCracken's inactions. The cause notice did not provide any explanation for what McCracken's role in developing a marketing plan was or how he had failed

23

in that duty. This affidavit excerpt, then, provided no evidence of how McCracken had failed in this duty.

In the excerpt of Schobel's affidavit, he testified that prior to hiring McCracken, "[s]ome of us attended a few conferences and gave a few speeches and let friends/Industry Contacts know what we were doing." This evidence is some evidence of marketing activities done by MonoSol before hiring McCracken. It does not provide any reason why activities of the same nature could not reasonably be continued by McCracken as part of the company's marketing strategy. Thus, MonoSol's assertion that McCracken continued these activities does not indicate that McCracken was failing in his duty to market the company.

The MonoSol document cited as support was a chart that appears to have been attached to minutes from a September 2008 "Leadership Team Meeting." The chart was labeled as "the results of our discussion" and stated that it would be used for further discussion. The chart indicated that "John" (presumably McCracken) was assigned the initiative "Generate Revenue," and as part of that initiative was listed the task "Product & Marketing strategy." This is some evidence that McCracken had some responsibility for the product and marketing strategy for MonoSol, but it does not establish what McCracken had to do to perform that duty.

In the excerpt of McCracken's deposition, he agreed that one of his duties was, "develops and implements strategic and tactical marketing programs to drive revenue growth and product contributions." When asked if he had prepared

24

a comprehensive marketing plan, he stated, "We had a marketing plan for the company that was being executed, yes. Did I actually prepare the marketing plan? I prepared a proposal on what we should be doing from a marketing point of view and discussed that with [Schobel] and [Kendall]."

He further stated that "most of the activity prior to [February 2009] was really focused on bringing in business, and it was clear from a marketing point of view where our focus as a company was." And he stated that he developed "strategic marketing programs in a sense of seeing where the market was most excited about our technology" and that "there was an understanding of our strategy, and there was an understanding that was clear on what our marketing plans were." This testimony is some evidence that McCracken had a marketing strategy, albeit perhaps not a written one, and that the management team was aware of that strategy.

To counter MonoSol's evidence, McCracken relied on his own affidavit, which referenced the self-assessment he had completed while still at MonoSol. In his affidavit, he stated that "[t]he extensive listing of activities on [the self-assessment] show[ed] that [he] was performing [his] job duties, including by targeting business customers, executing [MonoSol's] well known business strategy, and marketing to new potential customers." He also stated that he had "made countless telephone calls and sent numerous e-mails to promote [MonoSol]'s products." The self-assessment stated that he had supported an update of MonoSol's "company message/profile" and had "[b]roadly

25

communicated [MonoSol] to business development community through personal contacts and Licensing Executive Society."

MonoSol's evidence does not establish as a matter of law that McCracken did not perform his duties with respect to marketing. Accordingly, the trial court could not have properly granted summary judgment as to McCracken's claim for severance on the ground that McCracken did not perform his marketing duties.

**(iii) Failure in Contract Negotiation and Administration**. MonoSol next asserted that McCracken had a duty to negotiate and administer contracts, that he acknowledged this was one of his duties, and that he failed to perform it. As evidence that this was McCracken's job and that he acknowledged it as one of his duties, MonoSol cited to McCracken's deposition. In that excerpt, he stated, "I was responsible for establishing relationships with key partners, customers, and alliances." That characterization of the job duty is similar but not identical to "negotiate and administer contracts."

MonoSol then asserted in its motion that as part of this duty, McCracken was supposed to negotiate the most favorable terms possible. It did not, however, cite any evidence to support this proposition, except to the extent that this duty could be reasonably included in "establishing relationships with key partners, customers, and alliances."

As examples of McCracken's failure in this duty, MonoSol mentioned three agreements that McCracken worked on during his time at MonoSol. The first two examples were for contracts for which it contended that Kendall had wanted

26

certain terms to be included, but for which McCracken had "timidly counseled that MonoSol Rx" should not attempt to negotiate those terms, resulting in Kendall deciding to handle the negotiations himself. For the third example, it discussed McCracken's work on a deal with KemPharm. It alleged that Kendall wanted a certain term in the proposed contract to be modified and that Kendall had to "inject himself into the negotiations after McCracken incorrectly drafted contract[] language that would have created a loophole allowing KemPharm to opt out of the contract and bypassed MonoSol Rx's attorney."

The evidence it cited, however, did not support MonoSol's version of the facts. For the first example given by MonoSol, the evidence it cited was McCracken's deposition testimony. McCracken stated he had worked on the deal, that Kendall had led the effort to enter into a revenue generating agreement with the company, and that MonoSol had been working on the deal before McCracken started working there. MonoSol also cited Kendall's deposition testimony stating that McCracken "didn't believe we could get a 50/50 deal out of [that company] for our technology, which is exactly what we did." For the second example, MonoSol cited Kendall's deposition, in which he stated that for this agreement, as with the previous agreement, McCracken did not believe that MonoSol could negotiate the terms that Kendall wanted but that MonoSol was able to get the desired terms. This evidence shows only that, according to Kendall, McCracken had doubts about whether MonoSol could get these potential partners to agree to the terms MonoSol wanted. This does not show as

27

a matter of law that McCracken failed at "establishing relationships with key partners, customers, and alliances" or failed to negotiate and administer contracts.

As for the third example of McCracken's failure in negotiating and administering contracts, in which MonoSol asserted that Kendall had to become involved in negotiations to fix language in the agreement with KemPharm, MonoSol again cited Kendall's deposition. In the excerpt relied on for this proposition, Kendall claimed that he had asked McCracken "to fix certain language with our attorney to close one of the loopholes that we thought they were creating in the term sheet, specifically around what would give them the ability to exit the agreement" and that Kendall "told him specifically to create language to close this out and to correct the document they had sent to us." Instead of consulting MonoSol's attorney, McCracken "authored the language himself. He did not show it to the attorney. It was not complete. It was not thorough. It did not do what we intended it to do, as he and I discussed; and he forwarded it on to the other side."

MonoSol also acknowledged in its motion, however, that "McCracken contend[ed] this was a misunderstanding." And in fact, in the excerpt of McCracken's deposition included by MonoSol, McCracken stated, "I wasn't specifically asked to have it reviewed by an attorney," and "there was a misunderstanding on whether the wording that I had discussed with Mr. Kendall was adequate or whether it needed to be reviewed by an attorney." Thus,

28

MonoSol's own evidence demonstrated that, for this example, there was a fact issue about whether McCracken was failing in his duty with respect to contracts.

As further evidence of McCracken's failure to perform, MonoSol claimed that McCracken did not negotiate any "feasibility/development agreements with customers that he initiated," and that the three agreements he did negotiate were with customers that MonoSol had prior to McCracken's hiring, and he "negotiated contracts for the feasibility work but did not negotiate revenue generating manufacturing contracts." It claimed that the agreement that McCracken negotiated with KemPharm came about only after that company contacted him rather than the other way around and that the deal may never reach the manufacturing stage because KemPharm's product is "tied up in litigation." It cited McCracken's deposition testimony in which he acknowledged that he had signed some feasibility studies but those studies had not resulted in revenue generating agreements, as well as Kendall's deposition in which he stated that the KemPharm deal was "uncertain" because of litigation.

None of this testimony established as a matter of law that McCracken failed in his duty to negotiate and administer contracts or to establish relationships with partners. Even if the companies he worked with were already MonoSol customers, he still negotiated contracts with them. And the testimony suggested that a feasibility study is the first step in getting a revenue generating agreement. MonoSol points to no evidence that, in connection with this duty, only negotiation and administration of revenue generating agreements

29

constituted performance of that duty. The trial court therefore could not have properly granted summary judgment on the ground that MonoSol established as a matter of law that McCracken failed to negotiate and administer contracts.

**(iv) Failure to Participate on the Leadership Team**. Another way MonoSol argued that McCracken had failed to perform his duties was by failing to participate on MonoSol's leadership team as a leader "Who Likes Challenges" and who "Drives Business Development Results." It contended that McCracken's duties included "be[ing] the leader who drove himself and others to help achieve the financial objective for 2009," but "[i]nstead, in the presence of the rest of the Leadership Team, McCracken objected to the 2009 revenue goal," "want[ing] it reduced." MonoSol alleged that "Kendall and Schobel considered McCracken's conduct to be evidence that he was not fully participating as the Leadership Team member who was supposed to embrace challenges and lead and drive business development."

As evidence of these assertions, MonoSol directed the trial court to excerpts of McCracken's deposition and excerpts of Kendall's deposition. In Kendall's deposition, he stated that McCracken had said that he did not want to be pinned down on financial goals. Kendall further stated, when asked if he viewed expressing doubt about financial goals as "a problem,"

> I believe it was a problem that [McCracken] backed away from goals he participated in creating and the path and the actions for which he participated in creating, and in front of his peers when we got that far into the process he said, I really don't want to be pinned down.

30

Our process had—our process was an open process. People were able to express their concerns at any time. The issue wasn't expressing doubt, and at the time John wasn't simply expressing doubt. It was the theme throughout our conversations, John and I, where he would say, I don't want to be pinned down. I don't want a specific target. Wow, that's going to take a lot of work. Wow, that's going to be hard. And when that came across to his peers, they got nervous.

In McCracken's deposition, he acknowledged that it was his "goal and objective to ensure nine million of new business revenue." But as for bringing in the $9 million personally, he stated, "Nine was to be new business revenue. Whether I generated it or it came from other support groups in the company, . . . I don't think it particularly mattered. It was to make sure that we got the nine million in revenue." And with respect to objecting to the revenue goal, he stated that he "felt they were stretch goals, and in the beginning I would have liked to have seen the targets lowered, yes," but "I don't recall if I asked [that they be lowered]. I expressed my concern" to Kendall.

This evidence did not show as a matter of law what was required by McCracken's duty to be a leader "who likes challenges" and who "drives business development results," and it did not show as a matter of law that McCracken was failing to meet that duty. It showed that McCracken expressed doubt about the financial goals of the company, and it at most raised a fact issue about whether the way he expressed that concern was a failure to perform a job duty.

**(v) Failure to Develop and Execute New Methodologies or Strategies for Processes of Selecting SFIs and Selecting Pharmaceutical Companies to Pursue for Commercialization of SFIs**.  Another basis given by MonoSol for finding cause to fire McCracken was his failure to develop and implement new methods or strategies with respect to SFIs.  MonoSol alleged two different responsibilities of McCracken related to SFIs:   (1) selecting SFIs and (2) selecting pharmaceutical companies to pursue for licensing out SFIs.  MonoSol alleged that McCracken had acknowledged in his deposition that it was his duty to develop new strategies.

In the section of McCracken's deposition relied on by MonoSol with respect to this duty, McCracken acknowledged that one of his duties was "new business development strategies," with the clarification that this duty did not include "new research product development strategies."  He also stated that his responsibilities included licensing out SFI products and that he had a role in identifying SFIs.  This evidence supported MonoSol's claims about McCracken's role to identify and license out SFIs, but only to the extent that such a duty fell within the category of "new business development."

In this part of its motion, MonoSol did not direct the trial court to any evidence explaining how the duty to identify SFIs and license them out fell within "new business development" as opposed to "new research product development strategies," which McCracken said was not one of his duties.  It also did not

32

explain or point to evidence explaining that he was supposed to develop a new, written method for identifying SFIs.

MonoSol alleged in its motion that McCracken "did not perform his duty to develop for MonoSol Rx with a new game plan or strategy to analyze and evaluate data . . . to identify drugs . . . for development as SFIs," choosing instead to "basically continu[e] what others had done prior to his hire." Also under this category, MonoSol contended that McCracken had failed to provide MonoSol "with a new game plan or strategy to guide [MonoSol] in its pursuit of pharmaceutical companies that would be willing to pay for the manufacture of SFIs." And MonoSol contended that because McCracken did not develop a strategy to identify SFI targets, "McCracken's SFI results that he found and initiated were zero" and that "[a]t the time of his termination, McCracken had not produced any contracts for the manufacture of SFIs and was not in the process of . . . negotiation of a contract for the manufacture of a SFI." It acknowledged that McCracken had finished the negotiations in a deal with Hikma, but it did not consider that as performance of his duty because negotiations of the agreement began before McCracken was hired. In summary, MonoSol contended that McCracken neither identified drugs for SFIs nor successfully found partners for SFIs, and it discounted the deal that McCracken had worked to close.

As evidence to support these contentions, MonoSol relied on Schobel's deposition, McCracken's deposition, and a document prepared by McCracken while at MonoSol. In Schobel's deposition, he was asked about the problems

33

listed in the cause notice given to McCracken and what evidence the company intended to use to prove McCracken's noncompliance. Regarding the requirement that McCracken "'provide a strategic directional selection process for SFI candidates and partnership targets,'" Schobel replied that

> There was not a fulsome—a fulsome strategy ever outlined to me with tactical components underneath it. There may have been some work around looking at SFIs, yes. I'll admit that, that John did present some. It was a regurgitation of old information, in fact, information that John was probably given when he started with his employ with us.

The McCracken document used by MonoSol for this point was one that he had prepared in October 2008. The document listed various drugs and information about the manufacturer and usage for each drug. For each drug, McCracken noted whether U.S. sales for the drug were increasing, decreasing, or stable. MonoSol stated that production of this document did not "perform [McCracken's] duty, however, as McCracken dispositively admit[ed] [that] the document did not contain a recommendation of a new SFI or a strategic selection process for SFIs."

In the portion of McCracken's deposition relied on by MonoSol, he acknowledged that this particular document did not contain a recommendation for an SFI. He also stated that the purpose of the document was to show the SFI candidates and their stage of development for use in discussions evaluating which opportunities "looked the most exciting for self-funded projects to move up." MonoSol also directed the trial court to parts of McCracken's deposition

wherein he was asked about several specific drugs and whether he had licensed them, and he stated that he had not.

Regarding the Hikma deal, McCracken acknowledged in his deposition that the process had been started before he was hired, but he also stated that the deal was "dead" at that point and that he "resurrected it." In other words, McCracken's testimony was that but for his efforts, the Hikma deal would not have been completed. And in McCracken's response, he asserted that he had been told that SFI spending was put on hold, and until he received his cause notice, he had not been told that this had changed.

McCracken supported this assertion with his affidavit, in which he stated that at a June 2008 meeting, Kendall announced that spending on SFIs would be put on hold. He attached portions of Schobel's deposition in which Schobel acknowledged that McCracken had been told this and that he had never told McCracken to disregard that instruction. Parts of Schobel's deposition attached to MonoSol's motion also acknowledged that it had been announced that the SFI program had been put on hold, and when asked if McCracken had ever been told "that the green light was given for self-funded initiatives to move forward," Schobel answered, "I am not aware of any discussion to that fact, no." Thus, although MonoSol stated in McCracken's cause notice that he needed to cure his job performance by providing strategic direction on SFI candidate selection, the evidence raised a question of fact about whether his failure to produce any SFI candidates to that point was a failure to perform his job duties.

The summary judgment evidence does not establish as a matter of law that McCracken's duty was to develop a written strategy to select SFIs and that he failed to perform his duty. Accordingly, the trial court could not have properly granted summary judgment as to McCracken's claim for severance on this ground.

**(vi) Failure to develop a strategy to identify optimal potential clients and to execute that strategy**. Another example given by MonoSol of McCracken's failure to perform his job duties was that he had failed to develop a strategy or method for identifying optimal target companies for solicitation of new business from (1) drugs already approved by the FDA, (2) drugs awaiting FDA approval, and (3) over-the-counter drugs (collectively non-SFI categories).

In its motion, MonoSol alleged that the job position specification given to McCracken by a headhunter during his hiring process included the three non-SFI categories of drugs as sources of revenue for MonoSol.

McCracken testified that it was his duty to establish and implement new business development strategies; to establish "tactical plans that execute the business development strategies"; to assess future markets; to identify, evaluate, and pursue new market opportunities; to develop a marketing strategy; and to establish new scientific and strategic partnerships.

In McCracken's deposition, he stated that the goal of the new strategies he was to develop was to identify other companies that would license MonoSol's technology and products. McCracken did not give MonoSol a new game plan for

36

how to select and target optimal drugs in each of the three non-SFI categories. He did not present any data to narrow down thousands of drugs to those that were the ideal targets. He did not present MonoSol with any strategy or selection process for identifying optimal business partners. His response to interrogatories did not claim that any strategy document existed prior to February 2009.

McCracken produced a document in late February 2009, but this document did not set out a methodology for identifying optimal business targets. Instead, McCracken "resorted to initiating a quantitative volume of general contacts with pharmaceutical companies without first having qualitatively done the comprehensive data collection and analysis to develop strategic plans identifying the key or optimal targets." Most of his efforts at contacting companies were by telephone or email "since McCracken refused to comply with [MonoSol's] desire that he maximize fact-to-face contacts with pharmaceutical companies."

Kendall told McCracken that for each company he contacted, he needed to have a strategy. But despite that, McCracken "cannot recall anything in writing." Without a method for identifying optimal targets, the "contacts that McCracken initiated were uniformly unsuccessful in terms of results." None of his contacts produced a revenue generating agreement for a drug in one of the three non-SFI categories, and McCracken admitted as much in his deposition.

The evidence relied upon by MonoSol for the above assertions consisted of excerpts of McCracken's deposition, McCracken's response to interrogatories,

the job description from the headhunter, excerpts from Schobel's deposition, excerpts from Kendall's deposition, and Schobel's affidavit.

The job description listed "[h]as . . . an extensive network of industry contacts" as a "core competenc[y]." It listed as the "key responsibilities" of the job "establishing tactical plans, execution of business development strategy as it relates to key partnerships, alliances[,] and customer relationships and development of commercialization revenue opportunities." This evidence established that McCracken was put on notice that, if hired, his job could include such responsibilities. This job listing did not, however, establish as a matter of law what these responsibilities entailed.

In the referenced excerpts of his deposition, McCracken testified that one of his job duties was establishing new business development strategies. He also agreed that his duties included assessing future markets, identifying new market opportunities, establishing plans to execute business development strategies, identifying other companies that would want to license MonoSol's technology, and establishing new partnerships. MonoSol thus produced evidence that McCracken's duties included these acts.

As for evidence that McCracken failed in his duties under this category, Schobel stated in his deposition that he "never saw a single strategy about how [McCracken] was going to develop business relationships for targeting potential partners." In his affidavit, Schobel stated that McCracken did not provide him

38

with a methodology for selecting which drugs and pharmaceutical companies MonoSol should pursue and which it should not pursue.

In his deposition, Kendall described how one might go through narrowing down the long list of FDA-approved drugs to identify which drugs would be optimal for putting on film. Kendall testified that regarding what drugs were "technically feasible to do on film," "that analysis is missing."

In MonoSol's interrogatories, McCracken was asked to identify documents that set forth his process for selecting which companies MonoSol should try to partner with. McCracken's response to this interrogatory stated, "[McCracken] reviewed these materials with Mark Schobel and Keith Kendall in February of 2009." He stated that he had meetings with Kendall and that their discussions at the meetings "were very focused on business opportunities." At the meetings, McCracken and Kendall "discussed current projects, new projects and prospective business" but "didn't really discuss strategy." Nevertheless, "[t]he Business Strategy for MonoSol was quite clear to MonoSol Management." His "approach to executing this strategy was also clear during [his] regular meetings" that he had with Kendall; he described this approach as "1. Increase MonoSol visibility and awareness in the pharmaceutical marketplace. 2. Market MonoSol PharmFilm products and capabilities to new business contacts. 3. Generate new business."

In McCracken's deposition, he stated that he developed an oral strategy to "capture innovators" "for potential candidates," but he did not remember if he

39

developed a written strategy. He testified that he discussed this strategy at a February 2009 meeting. But he did not testify about when he had developed the strategy, whether it was around that time or before that.

Regarding the form of contact he had with potential business partners, he did not testify that he "refused to comply" with "MonoSol's desire" that he use mostly face-to-face contacts. His testimony was that Kendall told him that Kendall preferred face-to-face meetings when possible and that McCracken told him that "having an initial contact verbally would be preferable to going in cold and not—and spending the time and money for having a face-to-face meeting to see if there's initially assessment of interest." He also stated that "[he] did have face-to-face meetings with companies."

Regarding whether Kendall told him that he needed to have a strategy for each company he made contact with, he stated that "the overall strategy was part of the assessment." He also testified, when asked if he had included a strategy in any written reports to Kendall, that "[t]he strategy for each project, [his] expectation is it was discussed as opposed to written" and "part of what we talked about at each of our meetings was the overall strategy of how we were going to, you know, achieve success." And he stated that "whenever [Kendall] asked [McCracken] for something, [he] did it."

McCracken agreed that none of his efforts resulted in a revenue generating agreement for the three non-SFI categories. When asked why not, he testified that he could not recall the discussions with companies he worked with

40

but "believe[d] there was some issues with cost of goods relative to the pricing that they could achieve." MonoSol's evidence did not establish as a matter of law what exactly this duty entailed and whether he failed at it—including whether McCracken had to have a written strategy, whether MonoSol executives were aware of the strategy that McCracken was using, and whether he had a viable plan for establishing contact with potential business partners.

In his response to the summary judgment motion, McCracken cited his affidavit, in which he stated that he had "execut[ed] [MonoSol's] well known business strategy," that "[t]here had been no prior occasions in which Mr. Schobel or Mr. Kendall requested strategic direction review as [his] priority was to create business development value," that "[t]his priority was reinforced in all [his] one on one meetings with Mr. Kendall," and that "[t]he business strategy of MonoSol was clear and well understood by Management." He stated that projects in the pharmaceutical industry take six to nine months to mature "into substantial agreements."

Regarding his role in developing business strategies, McCracken stated that while at MonoSol, he regularly met with Kendall. Their discussions at these meetings "included, without limitation, decisions about business development priorities, strategies, goals and updates on key initiatives. During these meetings, [he] regularly discussed key projects with Mr. Kendall and mutual agreement was consistently reached on priorities, which [he] diligently executed." Thus, McCracken produced evidence that Kendall was aware of and in accord

41

with McCracken's business development strategies and goals. And as to the contact he had with target companies, he provided a list of face-to-face meetings that he had had, which were in addition to telephone calls he made and e-mails he sent to promote MonoSol's products and product development capabilities.

The summary judgment evidence showed that part of McCracken's job duties included identifying companies that would want to partner with MonoSol and license its technology. The evidence raises a fact question about whether MonoSol was aware of McCracken's business strategies and goals and whether it supported his efforts, or at least led him to believe that it was in agreement with his efforts. And the evidence did not show as a matter of law that McCracken's job duties included establishing a new, written strategy for identifying drugs in each of the three non-SFI drug categories that would be optimal for film. Even the cause notice did not explicitly require McCracken to put a strategy in writing; it stated only that to cure, he needed to "[c]reate and execute a business development/relationship strategy" and to "[d]emonstrate capability to own, direct[,] and execute establishing and binding strategic relationships." Accordingly, the trial court could not have properly granted summary judgment on McCracken's claim for severance on the ground that McCracken failed to perform this job duty.

**(vii) Failure to develop and execute plan to achieve 2009 revenue goal**. MonoSol also asserted that McCracken failed to perform his duty of producing revenue for MonoSol. MonoSol made two related claims regarding

42

McCracken's responsibility for generating revenue: that McCracken had failed to develop and execute a plan to achieve MonoSol's 2009 revenue goal and that McCracken had failed to actually produce MonoSol's revenue goal of $9 million in revenue in 2009.

MonoSol stated that the job specification given to McCracken by the headhunter "gave the core competency of 'Driving Results:  Sets compelling goals and is tenacious in accomplishing them.  Ability to set priorities, allocate resources, take accountability and achieve results.'"  By September 2008, "McCracken had been informed in writing that his 2009 revenue goal was to generate $9 million of new business."  MonoSol contended that this revenue goal had been given to McCracken in writing on multiple occasions.  This goal was "important to MonoSol Rx's balance sheet," and "[i]t was McCracken's duty during the remainder of 2008 to develop a methodology or strategy to achieve the 2009 revenue goal."

To accomplish that duty, "McCracken was to prepare a strategy and list the tasks that needed to be performed in order to achieve the 2009 revenue goal," but he failed to do so and had no explanation for his failure when asked about it in his deposition.  By the end of January 2009, "with the year 1/12th complete, MonoSol Rx still had not received from McCracken a game plan or strategy for achieving the revenue goal for 2009."

As evidence that McCracken was aware of his performance target and that McCracken failed to perform this duty, MonoSol relied on McCracken's

deposition, excerpts of Kendall's deposition, Kendall's affidavit, excerpts from Schobel's deposition and from his affidavit, and some documents. One of the documents relied on by MonoSol was the job specification from the headhunter. This language of the job listing was evidence that McCracken had been made aware that MonoSol wanted to hire someone who could set and achieve "compelling goals," but it did not establish that McCracken's job duties included achieving the specific revenue goals created by MonoSol, what this duty involved, or even that the job specification became his job description once hired.

The second document relied on by MonoSol was a chart that was attached to minutes from a September 2008 business meeting. MonoSol relied on this chart to establish that by September 2008, McCracken had been informed in writing that his goal was to generate $9 million of new business.

The chart listed general company initiatives or goals, which were assigned to various employees. These general initiatives were broken down into more specific initiatives. The general initiative "Generate Revenue," which was assigned to McCracken, had six more specific initiatives associated with it. One of those specific initiatives was "Negotiate and execute deals (legal costs) worth $9MM in 2009." The wording of this chart is not clear as to whether McCracken was supposed to, in 2009, execute deals that would be worth $9 million or whether he was supposed to execute deals that would result in MonoSol receiving $9 million in revenue in the 2009 calendar year.

The third document relied upon by MonoSol was a document on MonoSol letterhead that set out "MonoSol Rx 2009 Goals and Objectives" for McCracken. This document was not dated. Under the "Financial" category, the document listed "[e]nsure $9M of new business revenue contribution in 2009, with a minimum of $1.5M in 2Q, 2009, $0.75M In 3Q, 2009[,] and $2M in 4Q, 2009." This language suggested that MonoSol wanted McCracken to execute deals that would generate revenue in 2009. But it also suggested that the goal was not a definite performance standard; it listed no minimum revenue goal for the first quarter of the year, and the minimums for the other three quarters add up to just under half of the $9 million alleged by MonoSol.

In the excerpts of Kendall's affidavit, he stated that at a leadership team meeting in September 2008, at which McCracken was present, "the Company laid out the Strategic Planning Process" and that McCracken was assigned the general initiative "'Generate Revenue.'" Schobel made a similar statement in his affidavit. Kendall further stated that "[i]t was McCracken's duty to develop a . . . strategy for producing $9 million of new revenue in 2009. McCracken did not provide or present to me a methodology, plan or strategy for producing $9 million of new revenue in 2009."

In the excerpt of McCracken's deposition, he was asked about a second chart, in addition to the one listing general and specific initiatives that was referenced in Kendall's affidavit. This second chart appears to have been prepared after the September 2008 meeting and before one that was scheduled

45

for October 2008.  The top of the chart stated, "to prepare for a better discussion at the LT meeting on 10/29, we would like you to take the next step in laying out the initiatives that you have been identified as the owner of."

Then, in a row that said "Negotiate & execute deals worth $9MM in 2009 (Mark/Keith/John)", there was a space for "Expected goals for 2009."  This space was blank, and in McCracken's deposition, he had no explanation when asked why this space had not been filled in.  Contrary to MonoSol's assertion, this deposition and chart did not show that McCracken did not create a plan, that he did not perform his duty with respect to revenue goals, or that he did not know why he failed to do so.  It showed only that (1) McCracken, Kendall, and Schobel all had something to do with negotiating and executing contracts and (2) McCracken did not have an explanation for why he had not filled in a chart for the October 29 meeting.

In Schobel's deposition, he stated that McCracken did not create or execute a strategy and that Schobel didn't "personally" see any progress in developing those strategies and getting them implemented.  To support the assertion that $9 million in revenue would be important to the company's balance sheet, MonoSol pointed out a section of Kendall's deposition in which he stated, "[I]f we didn't create the $9,000,000 revenue that . . . McCracken was responsible for through the strategies he was to develop, there was a possibility we could be in a negative cash balance."

46

In summary, MonoSol's evidence related to McCracken's failure to perform this duty consisted of the job specification from the headhunter describing the person for the job as someone who could set and achieve compelling goals; a chart related to a meeting that assigned to McCracken the task of "Negotiat[ing] and execut[ing] deals (legal costs) worth $9MM in 2009"; a document listing McCracken's goals and objectives listing "[e]nsure $9M of new business revenue contribution in 2009, with a minimum of $1.5M in 2Q, 2009, $0.75M In 3Q, 2009[,] and $2M in 4Q, 2009"; Kendall's affidavit stating that McCracken was responsible for the initiative of "Generating Revenue" and that "It was McCracken's duty to develop a methodology, plan or strategy for producing $9 million of new revenue in 2009," that the revenue was important for MonoSol's bottom line, and that McCracken failed to fulfill this duty; a chart that included an initiative assigned to McCracken and two others for negotiating and executing $9 million worth of deals and a space for expected goals, which McCracken did not fill in; Schobel's deposition stating that McCracken did not create or execute a strategy and that Schobel did not personally see McCracken making progress on that goal.

Looking at the evidence produced by MonoSol, the evidence was unclear, if not conflicting, about what exactly McCracken had to do regarding revenue generation in order to perform this duty, whether it was his responsibility alone to bring in $9 million in revenue, and whether he was adequately performing his job. The evidence did not establish as a matter of law that McCracken was required

47

to generate $9 million in revenue in 2009 in order to adequately perform his job duties.

In his response, McCracken pointed to his affidavit as evidence that he had performed his job duties as to revenue generation while at MonoSol. McCracken asserted in his affidavit that "projects in the industry typically take at least 6 to 9 months to mature into substantial agreements, and can take years to generate revenues when FDA approval of a new product is required." He further stated, "[a]t the time I was fired, I had complied with all of my 2009 quarterly financial revenue targets." He also discussed several deals that were executed while he was at MonoSol that were projected to bring in more than $9 million. Thus, McCracken produced some evidence that no one could meet the kind of goal that MonoSol now says that McCracken could have and should have met because deals in the pharmaceutical industry simply do not get executed and begin bringing in revenue that quickly. McCracken's affidavit, combined with MonoSol's evidence, raised questions about the actual specifics of his revenue goals and whether he was meeting them. Because McCracken produced controverting evidence about whether he was meeting his financial goals, and MonoSol's evidence did not establish as a matter of law that he was not meeting his goals, the trial court could not have properly granted summary judgment as to McCracken's claim for severance on this alleged failure to perform job duties.

In addition to the allegations MonoSol made that McCracken failed to perform his job duties prior to its giving him the cause notice, it further alleged

that he continued to fail at his job duties after receiving the cause notice in February 2009. Having held that MonoSol did not establish as a matter of law that it had cause to terminate McCracken's employment at the time that it gave McCracken the cause notice, we must also hold that it did not establish as a matter of law that it complied with the provision of the employment agreement for firing him for cause because before firing McCracken for cause, it had to give him notice and opportunity to cure. If MonoSol did not have cause to fire him at the time it gave McCracken notice, it could not fire him for cause. If cause to fire him developed after that time, he was entitled to notice of it and an opportunity to cure. Accordingly, MonoSol did not establish its right to judgment as a matter of law on McCracken's claim for severance.

MonoSol also asserted that it had negated as a matter of law that its determination that it had cause to fire McCracken was made in bad faith and that it was therefore entitled to summary judgment. We have already held that McCracken had produced some evidence to raise a fact issue about whether MonoSol breached this covenant. And because we have held that McCracken raised a fact issue about whether MonoSol breached the express terms of the employment agreement by firing him without cause and not paying him severance, we need not address MonoSol's traditional ground on this claim.

3.1.5. *Cause notice and cure period: the traditional summary judgment grounds*.

MonoSol asserted as a ground for traditional summary judgment that it had negated McCracken's claim that he did not receive the notice required under the

agreement and that it did not allow him the full period under the agreement to cure any deficiencies before it terminated him. Because we have held that MonoSol did not establish as a matter of law that it had cause to terminate McCracken's employment, we need not reach this part of McCracken's second issue. We sustain McCracken's second issue.

*3.2. McCracken's breach of contract claim based on failure to pay bonuses.*

McCracken argues in his first issue that the trial court improperly rendered summary judgment dismissing McCracken's bonus claims. We first consider MonoSol's no-evidence summary judgment grounds on this claim.

*3.2.1. Failure to pay bonuses: no-evidence grounds.*

In its motion, MonoSol asserted four no-evidence grounds on McCracken's claim for breach of the express terms for bonus payments: (1) as a matter of law, there is no promise to pay, or, alternatively, there is no evidence of a promise to pay; (2) regarding the 2008 bonus, there is no evidence that McCracken performed his duties for that year and hence no evidence that he achieved his 2008 performance targets to make him eligible for a 2008 bonus; (3) as to the 2009 bonus, there is no evidence that McCracken met his performance targets for that year in order to be eligible for a bonus for that year; and (4) with respect to the 2009 bonus, there is no evidence that McCracken was employed on the day in 2010 when the bonus for calendar year 2009 was paid.

The first ground is a pure matter of law ground and therefore not a proper ground for no-evidence summary judgment.[25] We now turn to the other no-evidence grounds asserted by MonoSol.

The employment agreement contained the following provision relating to eligibility for bonuses:

> B.  Bonus.  In addition to the Base Salary, at the end of each (12) month calendar year during the Employment term, [McCracken] shall be eligible, if then employed with [MonoSol], for an Annual Bonus of forty percent (40%) of [McCracken]'s Base Salary, provided [McCracken] and [MonoSol] achieve established performance targets.  [McCracken] must be employed by [MonoSol] on the day any bonus payment is paid under this Agreement in order to receive said bonus payment. . . . If [McCracken] and [MonoSol] exceed established performance targets, [MonoSol] may[,] in its sole discretion, increase the amount of the Annual Bonus.  The Annual Bonus payment will not be prorated based on months of service in the first year of this agreement.

Thus, under this agreement, there were three requirements to be satisfied before McCracken would be eligible for a bonus:  (1) McCracken had to achieve established performance targets, (2) McCracken had to be employed by MonoSol at the end of the calendar year for that year's bonus, and (3) McCracken had to still be employed by MonoSol on the date that the bonus payment would be paid under the agreement.  McCracken does not dispute that his employment ended in March 2009.

In McCracken's response, he stated that MonoSol never provided him with any written performance targets with respect to earning his 2008 bonus.  He

---

[25] *See Harrill*, 27 S.W.3d at 194.

made this same assertion in his affidavit attached to his response, and he further stated that he was never told that his general job description would be used for the purpose of determining his bonus. He also attached an excerpt from the deposition of MonoSol's managing member who made the decision not to pay McCracken his 2008 bonus and who stated that he did not reference any performance targets in deciding not to pay McCracken the bonus.

McCracken also asserted that MonoSol breached either the express provisions to pay the 2008 bonus or the implied covenant of good faith because the contract language's implication is that MonoSol was required to pay him a bonus if the tenure requirements and performance targets were met, but MonoSol never established performance targets for him and none were considered in deciding to deny him a bonus. Further, because other employees received bonuses that year (the day before McCracken was fired), the factfinder could infer that MonoSol's company targets were met. McCracken attached to his response part of Kendall's deposition in which he stated that he received his bonus for 2008.

Regarding the 2008 bonus, McCracken produced some evidence that he was never given any performance targets for his 2008 bonus eligibility, including establishing his regular job duties as performance targets. The summary judgment evidence shows that he was employed at MonoSol on December 31, 2008 and on the date that the 2008 bonuses were paid, and that other employees were paid their bonuses, indicating that MonoSol met its performance

52

targets. And even if the evidence had established that McCracken's job duties were his 2008 performance targets, we have already held that McCracken raised a fact issue about whether he was performing those duties. Accordingly, the trial court could not have granted no-evidence summary judgment on this ground.

MonoSol argues that McCracken did not challenge its no-evidence ground with respect to the 2009 bonus—that he was not employed at MonoSol at the end of the 2009 calendar year or on the date in 2010 when the 2009 bonuses were paid—and therefore we should affirm the no-evidence summary judgment on his claim for that bonus. MonoSol is correct that McCracken did not deny that he was not employed by MonoSol on those dates. But McCracken did argue that not paying him the 2009 bonus was a breach of the implied covenant of good faith because the reason he was no longer employed with MonoSol on those dates was that he was fired in bad faith. In other words, because McCracken was no longer with MonoSol on those dates, MonoSol's not paying him the 2009 bonus was not a breach of the express terms of the employment agreement. But the reason he was not employed at MonoSol on those dates was MonoSol's breach of the implied covenant.[26] In reviewing MonoSol's no-evidence grounds regarding McCracken's right to a severance, we have already held that a fact issue exists on whether McCracken was performing his job duties and whether, if McCracken was not performing his job duties, MonoSol acted in bad faith by

---

[26] *See Wood*, 21 A.3d at 1140.

denying him the opportunity to cure. Accordingly, we hold that the same evidence raises a fact issue, sufficient to defeat no-evidence summary judgment, about whether MonoSol acted in bad faith to deprive McCracken of his eligibility for the 2009 bonus.

MonoSol's final no-evidence ground with respect to the 2009 bonus was that McCracken had no evidence that he met his performance target of bringing in $9 million in revenue. We have already held that the evidence, viewed in the light most favorable to McCracken, raised a fact issue about McCracken's responsibilities regarding the $9 million revenue goal and whether he was performing those responsibilities. Accordingly, the summary judgment on McCracken's claim for the 2009 bonus could not have been properly based on this ground. We sustain this part of McCracken's first issue.

*3.2.2. Failure to pay bonuses: traditional grounds.*

MonoSol moved for traditional summary judgment on McCracken's claims that by failing to pay him bonuses, MonoSol breached the express terms of the agreement and the implied covenant. In addressing McCracken's arguments as to these grounds, we consider first MonoSol's grounds on the claim for breach of the express terms and then consider its grounds regarding the implied covenant.

MonoSol asserted that it had negated McCracken's claim for bonuses because it established as a matter of law that he did not meet his performance targets, and that it therefore negated McCracken's eligibility for the bonuses. We have already held that McCracken raised a fact issue about whether he did not

54

meet his performance targets. In considering MonoSol's no-evidence grounds on McCracken's severance claims, we held that McCracken raised a fact issue about his performance of his job duties. In considering MonoSol's traditional ground that it had cause to fire McCracken, we held that it did not establish as a matter of law that it had cause to fire him. We therefore further hold that, as to the 2008 bonus, MonoSol did not establish as a matter of law that McCracken did not meet his performance targets.

Regarding the 2009 bonus, as noted in our disposition of MonoSol's no-evidence ground on this claim, the evidence, viewed in the light most favorable to McCracken, raised a fact issue about whether McCracken met his performance target. We also held that MonoSol did not establish as a matter of law that McCracken was not meeting his performance target regarding the generation of revenue. MonoSol was therefore not entitled to traditional summary judgment on the ground that McCracken was not eligible for the bonus because he failed to meet those targets.

In addition to arguing that McCracken was not eligible to receive a bonus in 2008 or 2009 because he did not meet his performance targets, MonoSol also argued that it was entitled to traditional summary judgment on the 2009 bonus claim because it had negated McCracken's satisfaction of the contractual conditions to receipt of bonuses. It again argued that the employment agreement required that, in order to receive the 2009 bonus, McCracken had to have been employed both (1) on December 31, 2009 and (2) on the date in 2010 when the

55

2009 bonus was paid. Because the evidence showed that McCracken was not employed with MonoSol on either of those two dates, then under the terms of the agreement, he was not eligible for the 2009 bonus.

As stated above with respect to MonoSol's no-evidence grounds, we agree that MonoSol established that McCracken was not employed either at the end of 2009 or on the date that the 2009 bonuses were paid. We also agree that the terms of the employment agreement required him to be employed on both of those dates in order to be paid a bonus for 2009. But we also held that, in response to MonoSol's no-evidence motion, McCracken raised a fact about whether MonoSol acted in bad faith, thereby breaching the implied covenant.

MonoSol addressed the implied covenant claim in its traditional motion. It argued that by showing that McCracken did not meet his performance goals, it negated the deprivation, causality, and bad faith elements of the implied covenant claim. More specifically, it first argued that by negating McCracken's eligibility for a bonus, it negated the element that requires the plaintiff raising an implied covenant claim to have been deprived of the fruit of the contract. And it argued that by not performing, it was McCracken who caused the non-payment of the bonuses, and therefore "causality is absent." Furthermore, because McCracken did not meet his performance targets, MonoSol negated the element of bad faith. And specifically as to the 2009 bonus, MonoSol asserted that "the condition ([that McCracken be] employed on date in 2010 when bonuses paid)

56

has been negated which means that the non-payment of a 2009 bonus could not have been in bad faith."

But McCracken raised a fact issue on his performance and whether the firing was a breach of the implied covenant. MonoSol did not establish a right to judgment as a matter of law on whether it had cause to fire McCracken and whether he was meeting his performance targets. MonoSol therefore did not negate as a matter of law that it did not breach the implied covenant by failing to pay bonuses. Accordingly, we sustain the remainder of McCracken's first issue.

*3.3. McCracken's objections to MonoSol's evidence.*

In his third issue, McCracken argues that the trial court improperly overruled his objections to some of MonoSol's summary judgment evidence. He specifically objects to the trial court's failure to exclude as hearsay certain documents attached to Kendall's and Schobel's affidavits. Having sustained McCracken's first two issues, we need not address this issue.[27]

*3.4. McCracken's claim for statutory attorney's fees.*

In his fourth issue, McCracken asserts that the trial court improperly held him ineligible to collect statutory attorney's fees. MonoSol's no-evidence summary judgment motion does not set out what element for which there is no evidence with respect to McCracken's entitlement to attorney's fees. In the section of its motion discussing the elements of McCracken's claim for attorney's

---

[27] *See* Tex. R. App. P. 47.1.

57

fees for which it contended there was no evidence, that section states, in its entirety,

> a. As a matter of law, [McCracken] may not recover attorneys' fees. [McCracken] has contractually agreed that he will not seek or recover attorneys' fees.
>
> b. Alternatively, there is no evidence that, in light of the language in the Agreement, [McCracken] may recover attorneys' fees.

These are pure matter-of-law grounds based on an interpretation of the employment agreement and as such were not proper grounds on which a no-evidence summary judgment could have been granted. We sustain McCracken's fourth issue.

## 4. Conclusion

Having sustained McCracken's first, second, and fourth issues, and having overruled his third issue, we reverse the trial court's summary judgment and remand this case for further proceedings.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, WALKER, and GABRIEL, JJ.

GABRIEL, J., filed a concurring opinion in which WALKER, J., joins.

DELIVERED: October 2, 2014

58